201 F.3d 50 (2nd Cir. 1999)
 ELI ATTIA d/b/a ELI ATTIA ARCHITECTS, Plaintiff-Appellant,
v.
SOCIETY OF THE NEW YORK HOSPITAL a/k/a THE NEW YORK HOSPITAL, HELLMUTH OBATA & KASSABAUM, INC., TAYLOR CLARK ARCHITECTS, INC., and HOK/TCA ASSOCIATED ARCHITECHTS, P.C., Defendants-Appellees.
 Docket No. 98-7797
August Term, 1998
 UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
 Argued: Jan. 20, 1999
Decided: Dec. 27, 1999
 
 Plaintiff Eli Attia appeals from the summary judgment entered by the United States District Court for the Southern District of New York (Jed S. Rakoff, Judge) in favor of Defendants Society of the New York Hospital, Hellmuth Obata & Kassabaum, Inc., Taylor Clark Architects, Inc., and HOK/TCA Associated Architects, P.C. Attia alleged that Defendants misappropriated his drawings for the renovation of New York Hospital and falsely designated themselves as the source of his design for the renovation, thereby violating the Copyright Act and the Lanham Act. The Court of Appeals, Leval, J., holds that summary judgment was properly granted in favor of Defendants with respect to all claims.
 
 
 1
 Affirmed.
 
 
 2
 FREDERICK B. COHEN (Ross & Cohen, LLP, New York, NY), for Plaintiff-Appellant,
 
 
 3
 RICHARD P. JACOBSON (Colucci & Umans, New York, NY), for Defendants-Appellees.
 
 
 4
 Before: LEVAL, POOLER, Circuit Judges, and CURTIN, District Judge.*
 
 LEVAL, Circuit Judge:
 
 5
 Plaintiff Eli Attia appeals from the summary judgment entered by the United States District Court for the Southern District of New York (Rakoff, J.) in favor of Defendants Hellmuth Obata & Kassabaum, Inc., Taylor Clark Architects, Inc., HOK/TCA Associated Architects, P.C., and Society of the New York Hospital (collectively, "Defendants"). See Attia v. Society of New York Hospital, No. 95 Civ. 3021(JSR), 1998 WL 226167, at *1 (S.D.N.Y. May 5, 1998). The complaint alleged that Defendants copied Attia's drawings for the renovation of New York Hospital (the "Hospital" or "NYH") and falsely designated themselves as the source of his design for the renovation, thereby violating both the Copyright Act and the Lanham Act. The district court, concluding that no reasonable jury could find in Plaintiff's favor on any of his claims, dismissed them all and granted summary judgment in favor of Defendants. See Attia, 1998 WL 226167, at *3. We are convinced that the district court correctly dismissed the complaint and therefore affirm the judgment in full.
 
 I. BACKGROUND
 
 6
 A. Events giving rise to this lawsuit.
 
 
 7
 For many years, officials of the Hospital considered the possibility of expanding and modernizing its facilities, which are located at the edge of the East River at 68th Street in Manhattan. The Hospital entertained various proposals on how to proceed, including some that called for use of air rights over the F.D.R. Drive along the riverbank, which the Hospital acquired from the City in 1973. By the early 1980s, however, the Hospital had apparently concluded that using the air rights would be impractical in terms of both cost and operational efficiency. As of 1987, the Hospital's preferred solution, which it designated as such in a "Certificate of Need" filed with the New York State Department of Health, involved building on or "filling-in" existing courtyards on its campus. A design embodying this solution was prepared for the Hospital by Defendant Taylor Clark Architects, Inc. ("TCA").
 
 
 8
 In 1987, Peter Kalikow, a newly appointed member of NYH's Board of Governors, retained Plaintiff to devise an alternative plan for the Hospital's modernization. After several months' work, Plaintiff developed a concept centered on a new building that would be constructed on a platform over the F.D.R. Drive. He prepared a series of architectural drawings and sketches to present this concept, which he collected in a booklet entitled "Option 1A: Building Over the F.D.R. Drive--December 1, 1987," and supplemented with a second booklet dated March 1, 1988. The Hospital was impressed by the ideas Plaintiff had developed and advised the New York State Department of Health that construction over the F.D.R. Drive was its new "preferred" approach.
 
 
 9
 The Hospital engaged Plaintiff and TCA to work together as consultants to develop these ideas and test their feasibility. However, the relationship between Plaintiff and TCA turned acrimonious, and in August 1988, the Hospital terminated the consulting arrangement under which the firms had worked together. NYH paid Plaintiff approximately $500,000 for the services he had provided over nine months' involvement with the project.
 
 
 10
 In July 1988, NYH initiated a competition to select the architect who would design and build its Major Modernization Program. Plaintiff and TCA were both invited to compete.
 
 
 11
 Plaintiff's firm entered the competition as a joint venture with two other firms, but failed to make the cut. The four candidates remaining after the cut, including a joint venture of TCA and Defendant Hellmuth Obata & Kassabaum, Inc. ("HOK/TCA"), were instructed by the Hospital to submit modernization proposals tailored to a "[m]ajor new construction on air rights over the F.D.R. Drive with connections to renovated existing facilities." In February 1989, NYH declared HOK/TCA the winner. After years of work on the project, HOK/TCA prepared a set of "schematic design drawings," which the Hospital filed with the New York State Department of Health in February 1992.[1]
 
 
 12
 Plaintiff asserts that in January 1993, he saw an article in the New York Times that included an illustration of HOK/TCA's plan to erect a new building over the F.D.R. Drive, and concluded that HOK/TCA had infringed his copyright. He subsequently filed this lawsuit in the United States District Court for the Southern District of New York charging Defendants with copyright infringement,[2] violation of the Lanham Act, and unjust enrichment. The complaint alleged in main that Defendants had unlawfully copied his architectural drawings to effectuate the Hospital's Major Modernization Program, and had publicly misrepresented Plaintiff's "design, ideas and concepts" for the project as their own. In hearings before the district court, he argued specifically that HOK/TCA's schematic design drawings were "copies" of his protected materials in that they duplicated his "unique combination of design elements" as well as numerous individual design elements that he likewise characterized as "unique."[3] Plaintiff sought (inter alia) a judgment declaring him to be the "Design Architect" of the Hospital's Major Modernization Program, an injunction barring Defendants from taking credit for the design of the Program, and over $40 million in damages.
 
 
 13
 B. The district court's ruling.
 
 
 14
 Upon completion of discovery in September 1997, Defendants moved for summary judgment. The district court granted the motion in May 1998. See Attia, 1998 WL 226167, at *3. "The key issue on summary judgment," the court reasoned in its Memorandum Order, "is whether there is a genuine factual dispute as to whether or not plaintiff's and defendants' plans are substantially similar." Id. at *2. In analyzing this issue, the court found a series of differences between Plaintiff's designs and Defendants', and concluded that these
 
 
 15
 differences embrace what are indisputably basic features of hospital operation and logistics. Discounting these features simply transforms plaintiff's work into an unrealized concept or idea, and hence not copyrightable. Looking instead to the different ways in which plaintiff and defendants give expression to the concept of "major new construction on air rights over the F.D.R. Drive with connections to renovated facilities," any and every reasonable fact-finder must necessarily find that plaintiff's and defendants' designs are not substantially similar.
 
 
 16
 Id. at *3. The court accordingly dismissed Plaintiff's copyright infringement claims. See id. It then held that "[b]ecause plaintiff's Lanham Act and unjust enrichment claims are predicated on defendants' alleged misappropriation of plaintiff's copyrighted works, those claims [must] also [be] dismissed." Id. Plaintiff appealed.
 
 II. DISCUSSION
 
 17
 A. Alleged infringement by Defendants' schematic design drawings.
 
 
 18
 Plaintiff first contends that Defendants' schematic design drawings misappropriated the "unique combination of design elements" inherent in his overall "design solution" to the Major Modernization Program, including "at least twenty . . . [individual] design elements" featured in his depictions.
 
 
 19
 Defendants undeniably had access to Plaintiff's drawings and thus were able to copy them. We assume, as we must for purposes of Defendants' summary judgment motion, that the similarities are attributable to copying. See, e.g., Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 270 (2d Cir. 1999) (on motion for summary judgment evidence is reviewed in the light most favorable to the non-moving party).
 
 
 20
 The problem underlying Plaintiff's claim of copyright infringement, however, is that not all copying from copyrighted material is necessarily an infringement of copyright. There are elements of a copyrighted work that are not protected even against intentional copying. It is a fundamental principle of our copyright doctrine that ideas, concepts, and processes are not protected from copying. See Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960) (Hand, J.) ("there can be no copyright in . . . 'ideas'"); Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2d Cir. 1930) (Hand, J.) (same); 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright 13.03[B][2], at 13-58 (1998) ("Nimmer") (the principle "of nonprotectibility of concepts, processes, [and] methods . . . [has been] long recognized by the courts"). This principle is now codified in Section 102(b) of the Copyright Act: "In no case does copyright protection for an original work . . . extend to any idea, procedure, process, system, method of operation, concept, . . . or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. 102(b).
 
 
 21
 The purpose for which the Copyright Acts were adopted was to expand human knowledge for the general good by giving creative persons--authors--exclusive control of the copying of their creations as a financial incentive to create. See 1 William F. Patry, Copyright Law & Practice 22-36 (1994) ("Patry") (reviewing purposes underlying adoption of Constitution's Copyright Clause and the first Copyright Act); cf. U.S. Const., art. I, 8 ("The Congress shall have Power . . . To promote the Progress of . . . useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their . . . Writings . . . ."). As the law developed, however, it was adjudged that, if the exclusive rights of ownership extended to ideas, the result would be to retard rather than advance the progress of knowledge. See 4 Nimmer 13.03[B] [2][a], at 13-60 to 61 ("To grant property status to a mere idea would permit withdrawing the idea from the stock of materials that would otherwise be open to other authors, thereby narrowing the field of thought open for development and exploitation. This effect . . . would hinder, rather than promote, the professed purpose of the copyright laws, i.e., 'the progress of science and useful arts.'") (citation omitted). It became accepted as orthodox that ideas, like facts, belong in the public domain. A copyright thus protects not the author's ideas, but only her expression of them. See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 349-50 (1991) ("[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship.") (citation omitted); 4 Nimmer 13.03[A] [1][c], at 13-39 (describing the idea/expression dichotomy as "the very essence" of copyright law); 1 Patry at 314-19 (analyzing critical role of the idea/expression dichotomy in maintaining "balances between the copyright and patent systems, within the copyright system, and between the copyright system and the First Amendment").
 
 
 22
 Although no single "principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression,'" Peter Pan Fabrics, 274 F.2d at 489, the inquiry often turns on the level of abstraction or generalization of the works being compared. As Judge Hand elaborated in his well-known "abstractions" approach,
 
 
 23
 Upon any work . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist of only its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their 'expression,' his property is never extended.
 
 
 24
 Nichols, 45 F.2d at 121 (citation omitted). Thus an author who records an idea has no claim of copyright infringement against the taking of the idea. And if the idea is recorded at a very general level of abstraction, there may be little or nothing in the original work that is protected against copying.
 
 
 25
 The problem of distinguishing an idea from its expression is particularly acute when the work of "authorship" is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project. As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are "ideas" that may be taken and utilized by a successor without violating the copyright of the original "author" or designer. On the other hand, to the extent that the copier appropriates not only those ideas but the author's personal expression of them, infringement may be found.[4]
 
 
 26
 The failure of Plaintiff's claim lies in the principles outlined above. Plaintiff's "Option 1A" booklets do undoubtedly contain creative ideas on how to extend New York Hospital over the F.D.R. Drive in a manner that would connect the Hospital's existing buildings with the new structure. However, the drawings in his booklets are highly preliminary and generalized; they describe Plaintiff's proposed design at a very general level of abstraction. Defendants' schematic design drawings, in contrast, which HOK/TCA prepared over several years of work on the Hospital's commission, constitute a detailed expression of how to effectuate the Major Modernization Program by constructing over the F.D.R. Drive and restructuring existing buildings.
 
 
 27
 The issue we must decide is whether the similar elements that Defendants assertedly copied from Plaintiff's drawings were protected matter. Without doubt there are similarities between Plaintiff's drawings and Defendants' architectural plans. However, even assuming (as we must and do) that the similarities result from copying, we conclude there was no infringement, because the similarities do not go beyond the concepts and ideas contained in Plaintiffs' drawings.
 
 
 28
 Examples cited by Plaintiff as instances of copyright infringement include Defendants' taking of the following elements:
 
 
 29
 * placement of a new structure over the F.D.R. Drive in the same location;
 
 
 30
 * use of a 3-story high truss to transfer the weight of the new building spanning the F.D.R. Drive to rows of columns on either side of the Drive;
 
 
 31
 * integration of the new structure with the pre-existing buildings by aligning the new floor heights to mesh with the old;
 
 
 32
 * alignment of corridors in the new building with the pre-existing corridors to provide smooth internal traffic flow;
 
 
 33
 * insertion of a connecting roadway between 68th and 70th Streets to make a continuous traffic loop through the hospital complex;
 
 
 34
 * placement of emergency services on the new connecting roadway, with ambulance entrance and parking adjacent;
 
 
 35
 * placement of diagnostic and treatment functions on the lower floors
 
 
 36
 of the new building, and nursing on the upper floors;
 
 
 37
 * placement of a new main pedestrian area in the same location in the new building; * placement of a mechanical floor in the same location in the new building;
 
 
 38
 * arrangement of nursing floors using a long rectangular corridor divided into thirds by the placement of support care stations, with patient rooms surrounding the exterior of the corridor;
 
 
 39
 * the "unique combination" of Plaintiff's ideas for the Hospital expansion.
 
 
 40
 Consideration of these examples, which Plaintiff illustrated by setting Defendants' allegedly infringing drawings alongside his own, shows that no more was taken than ideas and concepts. The placement of a new building, the use of truss technology to transfer weight, the alignment of floor heights and corridors, the creation of a continuous traffic loop through the hospital complex, the placement of emergency services and ambulance parking along that roadway, the location of a pedestrian area and of mechanical equipment, the arrangement of space on particular floors - these are no more than rough ideas of general nature. They are barely a first step toward the realization of a plan. How these and other ideas would be expressed or realized in a finished plan is not even approached in Plaintiff's drawings.
 
 
 41
 We may assume with Plaintiff that the ideas taken, or at least some of them, are powerful, dynamic ideas of immense value to the successful enlargement of the Hospital. Under the law of copyright, however, the power of an idea does not improve the creator's right to prevent copying. The protection of copyright extends only to the author's expression of the idea. We find no instance in which Defendants have copied particularized expression that commands protection under the copyright law.
 
 
 42
 Our conclusion that Defendants took no more than ideas from Plaintiff's drawings is corroborated to some extent by Plaintiff's own characterization of the materials in his booklets. Plaintiff's first "Option 1A" booklet, for instance, states that "[t]he following planning approach will suggest an idea that was recognized in the past, but not pursued until this point," and that "[t]his report is for the purpose of demonstrating a concept. It is not meant to suggest a specific configuration or functional plan, but rather to explore a significant opportunity to improve the facilities and health care which comprise New York Hospital." (Emphasis added.) Similarly, Plaintiff's second "Option 1A" booklet states that
 
 
 43
 The intent of the first presentation of Option 1A was to establish the concept in general terms for the optimum modernization program for New York Hospital. This report is conceived as a continuation of the planning effort, the purpose of which is to suggest and outline a strategy . . . .
 
 
 44
 . . . This report is meant as a first attempt to stimulate thinking and discussion amongst the participants of the Planning Team and the Hospital.
 
 
 45
 (Emphasis added.)
 
 
 46
 The preliminary, conceptual nature of Plaintiff's drawings distinguishes them from the drawings at issue in each of the three precedents he cites in support of his copyright infringement claims. In each of these cases, architects sued for copyright infringement and prevailed; in each, however, the misappropriated architectural plans, unlike Plaintiff's, consisted of drawings that were sufficiently detailed to enable construction. See Eales v. Envtl. Lifestyles, Inc., 958 F.2d 876, 877-80 (9th Cir. 1992) (misappropriated plans consisted of "construction drawings"), abrogated on other grounds by Hunt v. Pasternack, 192 F.3d 877, 879-81(9th Cir.1999); Arthur Rutenberg Homes, Inc. v. Maloney, 891 F. Supp. 1560, 1563 (M.D. Fla. 1995) (misappropriated plans included "a complete set of blueprints containing specifications for all elements of the . . . floorplan, roof, elevations, and electrical and plumbing systems"); CSM Investors, Inc. v. Everest Dev., Ltd., 840 F. Supp. 1304, 1310-11 (D. Minn. 1994) (misappropriated plans "contain[ed] detailed specifications for the construction of the proposed" structure).
 
 
 47
 In distinguishing these cases, we do not mean to suggest that, in the domain of copyrighted architectural depictions, only final construction drawings can contain protected expression. And we express no view whether, in other circumstances, an architect's sketches of visual elements (for example, Frank Lloyd Wright's preliminary sketches of the facade of the Guggenheim Museum) might include the type of expressive content entitled to copyright protection. Plaintiff's drawings in this case, however, at least to the extent copied, consisted only of generalized ideas and concepts pertaining to the placement of elements, traffic flow, and engineering strategies. The allegedly copied matter consisted only of ideas and concepts, not of protected expression.
 
 
 48
 Furthermore, as the district court noted, Defendants' realizations differ materially from Plaintiff's concepts. For example, while it is true that in the engineering of the new structure spanning the F.D.R. Drive both Plaintiff's and Defendants' designs employ triangle-based trusses[5] to transfer the weight of the structure to the rows of columns at the Drive's exterior edges, and that in each case the trusses encompass the lower three stories, Defendants' design has very little in common with Plaintiff's. Plaintiff employed a series of identical, isosceles triangles three stories high. Defendants employed a markedly different arrangement of scalene triangles and trapezoids, with a two story truss stacked atop a one story truss; they relied on this arrangement in part to avoid having structural elements obstruct the most convenient flow of internal traffic through the building's longitudinal corridors and roadways. (Plaintiff's and Defendant's truss concepts may be compared in the illustration set forth in the appendix to this opinion.) If Defendants copied Plaintiff's idea of using truss-based engineering, they used the idea in a very different way.
 
 
 49
 Major differences are also readily apparent with respect to Plaintiff's and Defendants' layouts for a typical nursing floor in the new hospital wing, another design element that Plaintiff asserts Defendants misappropriated. Plaintiff's comparative illustration reveals at a glance how dissimilar his concept is from Defendants' realization. The size and spacing of almost all components are substantially different. The sole similarity lies in the use of a long rectangular corridor divided into thirds by the placement of support care stations, with patient rooms surrounding the exterior of the corridor.
 
 
 50
 Defendants point to numerous additional differences distinguishing their realizations from Plaintiff's drawings. These include differences in the configuration and dimensions of the new building, in the layout of the roadway connecting 68th and 70th Streets, in the flow of traffic through this roadway, in the circulation of emergency vehicles, in the location of parking, in the utilization of existing structures such as the Payne Whitney Clinic (which is razed in Defendants' design but maintained in Plaintiff's), and in the placement of elevators. Our review of the evidence leads us to believe that no reasonable jury could fail to credit the existence of these differences.
 
 
 51
 Plaintiff correctly asserts that, in determining whether there is "substantial similarity" between two works, "[t]he key . . . is . . . the similarities rather than the differences." Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1093 n.4 (2d Cir. 1977). We agree with Plaintiff that it is "entirely immaterial that, in many respects, plaintiff's and defendants' works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown." 4 Nimmer 13.03(B), at 13-52 to 53. Nonetheless, dissimilarity can be important in determining whether there is substantial similarity. See Durham Indus. v. Tomy Corp., 630 F.2d 905, 913 (2d Cir. 1980) (noting that "we have also recognized that numerous differences tend to undercut substantial similarity") (citation omitted); cf. Warner Bros., Inc. v. American Broadcasting Cos., 720 F.2d 231, 241-42 (2d Cir. 1983) (Newman, J.) (discussing relevance of dissimilarities in infringement analysis); 1 Patry at 709-11 (same). Where, as here, a defendant's work is dissimilar in the very respects in which it is claimed to be similar, that can obviously influence the conclusion as to whether the claimed similarity in fact exists or is substantial. Furthermore, dissimilarity in realization or expression can make clear, as it does in this case, that the similarity extends only to unprotectible concepts or ideas.
 
 
 52
 For the foregoing reasons, we conclude that the district court committed no error in dismissing Plaintiff's claim of copyright infringement with respect to Defendants' schematic design drawings.
 
 
 53
 B. Alleged infringement by Winkelman's rough sketches.
 
 
 54
 At the start of HOK's involvement in the Major Modernization Program, its chief architect Henry Winkelman made a number of rough freehand sketches of the ground plan of the existing Hospital complex that included possibilities for its expansion. Plaintiff claims that parts of these sketches were traced from drawings in his Option 1A booklets.
 
 
 55
 In the evidence he submitted to the district court, Plaintiff supported this contention by presenting an overlay showing the coincidence of certain lines carrying through from one of his Option 1A drawings to one of Winkelman's sketches. We agree with Plaintiff that the coincidence of a number of lines would raise a question of fact whether Winkelman, using a tracing method, made a rough copy of portions of Plaintiff's drawings.
 
 
 56
 Nonetheless, we reject Plaintiff's claim with respect to Winkelman's sketches for reasons similar to those elaborated above. Even assuming Winkelman copied from Plaintiff's drawings, what he copied was not protected matter. Some of the allegedly copied lines are simple statements of existing facts, such as the location of existing walls. Facts, like ideas, are in the public domain. See 4 Nimmer 13.03[B][2][b], at 13-63; 1 Patry at 314-15. A copyright does not give the original author exclusive rights over the facts stated in her work of authorship. It protects only the manner of expression employed in the statement of the facts. See Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 344-45 (1991) ("The most fundamental axiom of copyright law is that no author may copyright his ideas or the facts he narrates.") (internal quotation marks, citations, and alteration omitted). The copying of a line that has no expressive content but has as its sole purpose to identify the position of an existing wall takes only fact and nothing of expression; it does not infringe copyright.
 
 
 57
 Other arguably copied lines take nothing more than a general idea, such as the eastward extension of the Hospital's 68th Street entrance (so as to be able to join a ramp and roadway connecting with 70th Street). For all the reasons explained above, the copying of such an idea or concept is not protected by the copyright law.
 
 
 58
 C. Plaintiff's Lanham Act claim.
 
 
 59
 Plaintiff's final claim is that Defendants "falsely represented that they are the creators of [his] design solution and [his] copyrighted design drawings," thereby violating the Lanham Act. We believe that the district court properly dismissed this claim as well.
 
 
 60
 The statutory provision on which Plaintiff relies, Section 43(a) of the Lanham Act, 15 U.S.C. 1125, provides in relevant part that
 
 
 61
 (a)(1) Any person who, on or in connection with any goods or services . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
 
 
 62
 (A) is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods, services, or commercial activities by another person, . . . .
 
 
 63
 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 
 
 64
 Plaintiff correctly observes that this provision has been construed to prohibit misrepresenting the source of a product either (i) by "passing off," in which "A" sells its product under "B's" name, or (ii) by "reverse passing off," in which "A" sells "B's" product under "A's" name. See Waldman Publ'g Corp. v. Landoll, Inc., 43 F.3d 775, 780 (2d Cir. 1994); see also Restatement (Third) of Unfair Competition 5 (1995) ("One is subject to liability . . . if, in marketing goods or services manufactured, produced, or supplied by the other, the actor makes a representation likely to deceive or mislead prospective purchasers by causing the mistaken belief that the actor or a third person is the manufacturer, producer, or supplier of the goods . . . .") Plaintiff contends that Defendants committed "reverse passing off" by publishing his plans for the Major Modernization Program under HOK/TCA's name.
 
 
 65
 In support of his claim for reverse passing off, Plaintiff cites our decision in Waldman, arguing that Waldman demonstrates he may pursue this claim even if his copyright claim fails. While it is true that Waldman allowed the maintenance of a Lanham Act claim for reverse passing off by one who could not sue for copyright infringement, see 43 F.3d at 785-86, we believe that our reasoning in Waldman is in fact conclusive against Plaintiff's case.
 
 
 66
 In Waldman, plaintiff Waldman Publishing Corporation published a series of literary classics, abridged, simplified and illustrated for use by children. See id. at 778. Defendant Landoll subsequently published the same books, abridged, simplified and illustrated in a manner that resembled plaintiff's closely enough to "compel the inference that the Landoll adaptations [were] copies of the Waldman adaptations, with . . . minimal changes intended to disguise the copying." Id. at 782 (internal quotation marks and citation omitted).
 
 
 67
 At the time Waldman brought the action and moved for a preliminary injunction, it had not yet registered its copyright, and was therefore barred from pursuing a remedy for copyright infringement. See id. at 785-86. We held that this was not fatal to Waldman's Lanham Act claim because the two acts "address different harms." Id. at 781. Nonetheless, in determining whether Waldman had made out a claim of reverse passing off under the Lanham Act, we ruled that plaintiff needed to satisfy the same standard of "substantial similarity" that must be met in copyright cases. See id. at 783. The enormous similarities between plaintiff's and defendant's books with respect to their abridgement, simplification and illustration of the subject matter supported a finding that defendant's books were "substantially similar" to plaintiff's and were copied from them; this finding in turn supported the conclusion that defendant might have committed reverse passing off. See id. at 782-783. We accordingly permitted plaintiff to seek a preliminary injunction for violation of the Lanham Act. See id. at 786.
 
 
 68
 In the present case, however, Plaintiff has failed to show "substantial similarity," as that term is understood in copyright law. Whatever similarity exists between his drawings and Defendants' realizations relates only to ideas and concepts, elements that are not protected by the copyright law. The test for reverse passing off that we followed in Waldman therefore compels the conclusion that Plaintiff cannot prevail on his claim under the Lanham Act.[6]
 
 
 69
 We note that if Waldman's adoption of the "substantial similarity" test in the context of reverse passing off were not the rule, the principle of copyright that denies protection to ideas, concepts, and processes would become a dead letter. A plaintiff unable to prevail under the law of copyright could simply restate his claim as one of unfair competition for reverse passing off. Ideas would no longer be in the public domain. We do not think Congress intended that an obscure corner of the Lanham Act should be interpreted to nullify a fundamental precept of the Copyright Act.
 
 
 70
 We affirm the district court's judgment dismissing the claim of unfair competition under the Lanham Act.
 
 Conclusion
 
 71
 The judgment of the district court is AFFIRMED.
 
 
 72
 [Tabular or Graphical Material Omitted]
 
 Appendix
 Structure/Truss Design
 
 
 Notes:
 
 
 *
 The Honorable John T. Curtin, Senior United States District Judge for the Western District of New York, sitting by designation.
 
 
 [1]
 The American Institute of Architects' Handbook of Professional Practice describes "Schematic Design Documents" as documents that "illustrat[e] the scale and relationship of the Project components," and may include "a conceptual site plan, . . . and preliminary building plans, sections, and elevations." The American Institute of Architects, IV The Architects' Handbook of Professional Practice B141-1997 2.4.2 (1997).
 
 
 [2]
 In September 1988, Plaintiff had obtained copyright registration for the two booklets of "Option 1A" drawings and sketches he had presented to the Hospital.
 
 
 [3]
 Neither Plaintiff's complaint nor any of his subsequent submissions in this lawsuit indicates whether he registered his materials under the category of "pictorial, graphic, and sculptural works," 17 U.S.C. 102(a)(5), or "architectural works," 17 U.S.C. 102(a)(8). An author seeking to register a work under both categories must submit separate registrations. See 37 C.F.R. 202.11(b)(4) ("Where dual copyright claims exist in technical drawings and the architectural work depicted in the drawings, any claims with respect to the technical drawings and architectural work must be registered separately."). Plaintiff has provided no suggestion that he did so. Because the materials at issue are drawings, and because Plaintiff has not objected to Defendants' characterization of his copyright infringement claims as claims brought to protect "pictorial [or] graphic" works under Section 102(a)(5), we assume that his claims rely on that Section (rather than Section 102(a)(8)). This assumption, however, does not affect the outcome of the instant appeal. See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright 2.20, at 2-216 (1998) ("In general, architectural works are subject to the same standards that apply to other copyrightable works. For instance, the requirement[] of . . . infringement via substantial similarity [is] as applicable here as throughout the balance of copyright law.")
 
 
 [4]
 For an interesting discussion of the problems of applying the idea/expression dichotomy to functional works, see Jon O. Newman, New Lyrics for an Old Melody: The Idea/Expression Dichotomy in the Computer Age, 17 Cardozo Arts & Ent. L.J. 691 (1999).
 
 
 [5]
 A truss in engineering is "an assemblage of members (as beams, bars, rods) typically arranged in a triangle or combination of triangles to form a rigid framework (as for supporting a load over a wide area) that cannot be deformed by the application of exterior force without deformation of one or more of its members." Webster's New International Dictionary 2456 (3d ed. 1976).
 
 
 [6]
 Waldman also required the plaintiff to satisfy the standard of "original creation" derived from the copyright law in order to succeed in its claim of false designation of origin. See id. at 781-82. That additional requirement is not at issue here.