**David Shaw NICHOLLS, Plaintiff,**

v.

**TUFENKIAN IMPORT/EXPORT VENTURES, INC., d/b/a Tufenkian Carpets and James Tufenkian, Defendants.**

**No. 04 Civ. 2110(JCF).**

United States District Court, S.D. New York.

March 11, 2005.

See also 2004 WL 1399187.

Jonathan E. Moskin, White & Case LLP (NY), New York, NY, for plaintiff.

Michael Barry Carlinsky, Margaret Mary Caruso, Quinn Emanuel Urquhart Oliver & Hedges LLP(NYC), New York, NY, Robert William Clarida, Jason David Sanders, Cowan, Liebowitz & Latman, P.C., New York, NY for defendant.

## MEMORANDUM OPINION AND ORDER

FRANCIS, United States Magistrate Judge.

This case concerns the application of modern copyright law to designs embodied in an ancient medium: carpets. The plaintiff, David Shaw Nicholls, alleges that the defendants, Tufenkian Import/Export Ventures, Inc., d/b/a Tufenkian Carpets, and its principal, James Tufenkian, infringed his "Prado" design with two similar designs known as "Eclipse" and "Total Eclipse," and thereby violated the Copyright Act of 1976, 17 U.S.C. § 101 et seq. This case initially went to trial before the

Honorable William H. Pauley III, U.S.D.J., and a jury, but a mistrial was declared when an overzealous juror conducted internet research related to the action. The parties then consented to proceed to trial before me pursuant to 28 U.S.C. § 636(c), and they elected to waive their right to a jury. Accordingly, I presided over a bench trial on November 16, 17, and 18, 2004, and this opinion constitutes my finding of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

*Background*

David Shaw Nicholls began designing carpets in about 1993 or 1994. (Tr. at 42).[2] He created a number of designs that incorporated circular motifs, including the Ravenna, Sikri, Umbria, Cosmo–Cities, Constantinople, and Argyle designs. (Tr. at 48–49; Pl. Exhs. 10, 12, 13, 15, 16, 17, 101). According to Mr. Nicholls, one precursor of his Prado design was a carpet identified as Maui, which features large circles in which there is a spiral or scroll feature. (Tr. at 48–49; Pl. Exhs. 14, 101). The Maui design progressed to the Rio, where the circles were made smaller and arrayed in a symmetrical lattice. (Tr. at 52; Pl. Exh. 5). The Rio was never produced because Mr. Nicholls felt that it was not sufficiently unique. (Tr. at 52–53). Instead, he began attempting to soften the profile of the circles by transecting them, so that each half would be a different color. (Tr. at 53–54; Pl. Exhs. 5 at DSN000054, 6).

This concept evolved into the Prado, which can be described as including 20 equal size circles arrayed in five rows and four columns. At each end there is a rectangular band running the width of the carpet. At one end the band appears to cover the last row of circles so that only a row of hemispheres is visible. At the other end, the circles appear to overlap the rectangle. There are also rectangular bands of a different color running the length of each outer edge up to the point where they meet the bands running across the width. The lengthwise bands continue in a narrowed form across the width of the carpet just inside the bands at each end. These narrower bands are overlapped by the last row of circles at either end. Within these framing bands, the circles are arrayed on a background of a single color. Finally, each of the full circles is transected such that approximately three-quarters is one color and one-quarter is a different color. The transections are made widthwise, and they alternate so that if the one-quarter section is on the "bottom," in the first row, it is on the "top" in the next. The effect is as if each circle in one row is "facing" the corresponding circle in the adjacent row. (Pl.Exhs.1, 2, 101).[3]

The Prado was created in 1998 and went into production that year. (Tr. at 48). On January 18, 2002, Mr. Nicholls registered the design with the United States Copyright Office and received copyright number VAu 524–511. (Pl.Exh. 1). Together with the application, he submitted a wire frame diagram and a color reproduction of one sample of the rug. (Tr. at 45–46; Pl. Exh. 1). The wire frame diagram is a

---

1. Prior to trial counsel submitted motions *in limine* and at trial they raised various evidentiary objections. Because this was a bench trial, I generally accepted the evidence, reserving decision on its admissibility. In this opinion I will only make those evidentiary rulings that are material to the determination on the merits.

2. "Tr." refers to the trial transcript.

3. Defendants moved prior to trial to supplement the pretrial order to include among other things full-size samples of each carpet at issue. The carpets as manufactured are plainly relevant and no prejudice could result from their admission, so I am considering those exhibits.

schematic drawing or blueprint that shows the precise dimensions for each geometric element and identifies in generic terms where each of four colors would appear. (Tr. at 45; Pl. Exh. 1). The color reproduction depicted the carpet as produced in the color way designated "Ermine." (Pl. Exh. 1).

According to Mr. Nicholls, the Prado design received a good deal of publicity in the trade and in the general public. For example, it was depicted in a photograph accompanying an article in the May 28, 2000 edition of the *New York Times Magazine* about a house that the architect Philip Johnson designed for Blanchette Rockefeller. (Tr. at 75–76; Pl. Exhs. 35, 103). Mr. Nicholls created a "tearsheet" or advertisement from the *Times Magazine* piece and circulated it to perhaps 3,000 potential clients in July or August of 2000. (Tr. at 76–77; Pl. Exh. 36). Similarly, he created a postcard of the Prado design and mailed out some 3,000 copies to his customer base in June 2000. (Tr. at 78–79; Pl. Exhs. 42, 43). Thereafter, the Prado appeared in the October 31, 2000 issue of *Interior Design* magazine. (Tr. at 78; Pl. Exh. 38). The Prado design was also displayed at the *Architectural Digest* trade show at the Jacob Javits Convention Center in Manhattan for four days at the end of October and beginning of November of 2000, and a poster for the show that included a Prado rug was disseminated to Mr. Nicholls' customers some time in advance. (Tr. at 85–87; Pl. Exhs. 49, 101). Mr. Nicholls does not know whether Mr. Tufenkian ever saw an image of Prado before he created the allegedly infringing designs. (Tr. at 107).

Beginning in 1996, the parties had a business relationship pursuant to which the defendants manufactured carpets for Mr. Nicholls' company. (Tr. at 87–88, 267; Pl. Exh. 50). The arrangement ended acrimoniously, however, when a dispute resulted in a lawsuit. (Tr. at 89–90, 267–70). That litigation ended in a settlement. (Tr. at 90, 267).

Mr. Nicholls first became aware of the allegedly infringing designs when he encountered an advertisement in the December/January 2004 edition of *Elle Decor* magazine showing a rug identified as Total Eclipse. (Tr. at 90–91; Pl. Exh. 52). He subsequently learned of the Eclipse design by viewing Mr. Tufenkian's website. (Tr. at 96).

When Mr. Nicholls first saw Total Eclipse, he sent a letter to Mr. Tufenkian arguing that it was substantially similar to Prado and demanding that he cease marketing it. (Tr. at 91–92 & Exh. 53). A copy of this letter was sent to dealers whom Mr. Nicholls believed were Mr. Tufenkian's customers. (Tr. 91–92 & Exh. 53). In response, Mr. Tufenkian's attorney sent a letter to Mr. Nicholls' counsel indicating that Total Eclipse was a variation of Eclipse, and that the Eclipse design was registered with the Copyright Office in early 2001. Mr. Tufenkian's attorney expressed the belief that that date preceded the creation of Prado, and concluded that "[o]ur concern, as you can imagine, is that the 'Prado' design may prove to have been derived from the 'Eclipse' design, which was registered long before the 'Prado' design was published." (Tr. at 271–72, 275–76; Pl. Exh. 58).

At trial, Mr. Tufenkian testified that he had created the Eclipse design himself and, prior to doing so, had never seen Prado during the course of his business relationship with Mr. Nicholls or otherwise. (Tr. at 225, 240, 270). He did not see the *New York Times Magazine* article and never reads that publication. (Tr. at 265). Until this litigation began, he had never seen the postcard of the Prado design that Mr. Nicholls sent to his customers. (Tr. at 265). He did not view Mr.

Nicholls' website until after he had received the cease and desist letter from Mr. Nicholls' attorney. (Tr. a 265–66). And he did not attend the trade show at the Jacob Javits Center in 2000 where Prado was displayed. (Tr. at 266–67).

According to Mr. Tufenkian, he designed Eclipse with the assistance of Elizabeth Artinian, an artist skilled in computer graphics. (Tr. 240–41). Previously, Mr. Tufenkian had marketed designs that incorporated rectangular grids, on which geometric forms like circles or representational figures such as fish or leaves were superimposed. These included the Tumbledown, Hothouse, and Lagoon designs. (Tr. at 242–44; Def. Exh. KKKK at 124–25, 136–37, 202–03). He was also becoming interested in incorporating more circular figures in his designs. (Tr. at 249–52).[4] And, as early as 1992, he had experimented with what he calls the "magic tape" effect in the Pasha Smoke design. (Tr. at 252; Def. Exh. CC). That concept also appears in his Stripe Rag Flag design. (Tr. at 251–52; Def. Exh. EE). The effect is created by "superimposing" a geometric pattern—generally of rectangles—over an underlying design. The colors of the underlying images "change" as they are viewed through different portions of the overlaid grid. It is as if the designer took an image and covered it with translucent colored tape or with rectangles of different colors of cellophane. (Tr. at 252).

In the summer of 2000, Mr. Tufenkian worked with Ms. Artinian in Armenia, presenting her with his ideas and then making suggestions based on the computer images she created. (Tr. at 253–55, 307–09). The result was a series of images showing a grid of twelve circles overlayed by various patterns of rectangles and incorporating the "magic tape" effect. (Tr. at 305–06; Def. Exhs. QQQ, RRR, SSS, TTT, UUU).[5]

As finally manifested in Eclipse, the four rows of circles are evenly spaced one from the next, but the three columns are not; they are slightly asymmetrical. The circles are large and almost fill the rectangular space of the carpet. There is no "frame" because the circles extend to the edge of the rug on all sides, though rectangular bands that run widthwise at each end create a sense of boundary on those sides. The circles are transected by the rectangular shapes but not always in the same fashion: to the extent they are transected widthwise, some are divided once and others twice, and the proportion of each section varies from row to row. In addition, because some of the rectangular elements do not extend the full width of the carpet, some of the circles are transected lengthwise as well. (Def. Exhs. A, S, U, KKKK at 70–73). A total of eight colors are utilized, and because of the "magic tape" effect, both the circles and the "background" are composed of multiple colors.

Mr. Tufenkian testified that he went on to design Total Eclipse in approximately January 2003. (Tr. at 259). He was attempting to modify the Eclipse design by making it less "edgy" and more suitable for a somewhat older market. (Tr. at 259–60, 264). He achieved this effect by eliminating the widthwise breaks in the rectangular bands. In other words, all of the rectangular elements now extended the en-

---

4. At trial, the defendants sought to introduce source materials that Mr. Tufenkian allegedly relied on during the design process. (Tr. 245–49; Def. Exh. XXX). These exhibits were not identified in the pretrial order and were not produced in discovery and are therefore excluded from consideration.

5. Although not identified in the pretrial order, these exhibits were admitted without objection in the first trial (Trial transcript for September 13, 14, 15, 16, and 17, 2004 ("Trl.") at 326–27), and will be considered here.

tire width of the carpet. (Tr. at 261–63; Def. Exhs. C, T, KKKK at 94–95).

*Discussion*

A. *Validity and Scope of the Copyright*

 In order to establish copyright infringement, a plaintiff must demonstrate that he owns a valid copyright and that the defendant engaged in unauthorized copying of the copyrighted work. *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir.2003); *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir.2003). Issuance of a certificate of registration before or within five years of a work's initial publication creates a rebuttable presumption that the recipient is owner of a valid copyright. 17 U.S.C. § 410(c); *Jorgensen*, 351 F.3d at 51 (registration constitutes prima facie evidence of ownership); *Hamil America, Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir.1999) (presumption of ownership created by registration may be rebutted).

 In this case, it is undisputed that Mr. Nicholls received copyright Registration No. VAu 524–511 for the Prado design. The defendants suggest, however, that the copyright extends only to the "Ermine" color way, which was depicted in the photograph that was deposited with the Copyright Office along with a wire frame diagram. The force of this argument must be assessed in light of the dual purposes of the deposit requirement, which are: (1) to provide the Copyright Office with "sufficient material to identify the work in which the registrant claims a copyright" and (2) "to furnish the Copyright Office with an opportunity to assess the copyrightability of the applicant's work." *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1161–62 (1st Cir.1994); *see* 17 U.S.C. § 408(b). These goals are not undermined by interpreting the copyright here to include any color way consistent with the Prado design as defined by the wire frame diagram, even though an example of only one such color way was deposited with the Copyright Office. Indeed, "errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright." *Benham Jewelry Corp. v. Aron Basha Corp.*, No. 97 Civ. 3841, 1997 WL 639037, at *11 (S.D.N.Y. Oct.14, 1997) (citation omitted). This principle extends as well to incomplete or erroneous deposit materials. *See Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 486–87 (9th Cir.2000); *Data General*, 36 F.3d at 1161–62.

 On the other hand, a copyright does not encompass designs that vary in essential respects from what was presented to the Copyright Office. Otherwise, the purposes of the deposit requirement would be nullified. *See Three Boys Music*, 212 F.3d at 486–87 (copyright valid where inaccuracies in deposit copy were minor, not essential). A major element of Prado, both as testified to by Mr. Nicholls (Tr. at 65–66) and as reflected in the wire frame diagram or blueprint (Pl.Exh. 1), is the relationship between the colors. Thus, although the blueprint does not designate specific colors, it does identify where each of four generically-designated colors should appear. (Tr. at 105–06). Accordingly, to the extent that some of the color ways produced by Mr. Nicholls deviate from this pattern (Pl.Exh. 44), they are not protected by the copyright at issue in this lawsuit and cannot serve as the basis for the plaintiff's infringement claim.

 Registration creates a presumption not only that a copyright is valid, but also that the work is original. *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir.2001). While that presumption, too, may be rebutted, *see Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. 1328, 1335 (S.D.N.Y.1997), "the originality requirement for obtaining a copyright is an

extremely low threshold[.]" *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988). The party seeking protection need not show that the work is either novel or unique. *See Boisson,* 273 F.3d at 268. Prado easily meets the test for originality. It was not copied from existing works, but was the result of Mr. Nicholls' creativity. *See id.*

■■■ Nevertheless "[s]imply because a work is copyrighted does not mean every element of that work is protected." *Id.* Rather, protection extends only to "those components of a work that are original to the author." *Id.* Thus, in this case Mr. Nicholls' copyright does not provide him with an exclusive right to the use of circles in carpet design, because, although the Prado incorporates circles, it is not an original element. But a combination of otherwise unprotectible elements warrant copyright protection if the elements are selected, coordinated, or arranged in an original way. *See Tufenkian,* 338 F.3d at 136. That was the case here.

### B. *Evidence of Copying*

■■■ Having demonstrated that he owns a valid copyright, Mr. Nicholls must now establish the second element of copyright infringement: unauthorized copying. "'Actual copying may be established by direct or indirect evidence.'" *Jorgensen,* 351 F.3d at 51 (quoting *Boisson,* 273 F.3d at 267). However, "copiers are rarely caught red-handed," *Gaste,* 863 F.2d at 1066, and, therefore, "direct evidence of copying is seldom available[.]" *Jorgensen,* 351 F.3d at 51. Certainly, no such proof has been presented in this case. However, if there is sufficient proof that the defendants had access to the plaintiff's work and that their respective designs are similar, it may be inferred that the defendants engaged in copying. *Id.* at 51; *Boisson,* 273 F.3d at 267.

### 1. *Access*

■■■ To support a finding of copying, "there must be evidence of a reasonable possibility of access. Access must be more than a bare possibility and may not be inferred through speculation or conjecture." *Gaste,* 863 F.2d at 1066 (citations omitted); *see also Jorgensen,* 351 F.3d at 51. An inference of copying can be drawn "when the defendant had a reasonable opportunity to view the plaintiff's work before creating its own" and "when a plaintiff's works have been widely disseminated." *Odegard,* 963 F.Supp. at 1336 (citations and quotation marks omitted).

■■■ Here, while it is a close question, Mr. Nicholls has not presented sufficient evidence of access. He notes that the Prado was displayed at an interior design show at the Jacob Javits Center. Yet, Mr. Tufenkian did not attend that show, and, in any event, the show took place after Mr. Tufenkian had designed Eclipse. *Cf. Odegard,* 963 F.Supp. at 1337 (copying inferred in part from fact that defendants' designers attended trade show where plaintiff's carpet was displayed). Similarly, although the Prado was featured in various trade publications such as *Interior Design* that Mr. Tufenkian might well be expected to review, this occurred after he had designed Eclipse. (Pl.Exh. 38). While Mr. Nicholls also disseminated images of the Prado directly to his customer base, there is no evidence that any of the recipients shared the advertisements with the defendants. *See Dimmie v. Carey,* 88 F.Supp.2d 142, 146 (S.D.N.Y.2000) (rejecting mass mailing as evidence of access where no showing that mailings were ever forwarded to alleged infringers). And, although Prado is displayed on Mr. Nicholls' website, it is unclear when the image was first posted, and Mr. Tufenkian did not visit the website until after Mr. Nicholls

accused him of infringement. (Tr. at 191, 265–66). Perhaps the best evidence of access is the fact that Prado was depicted in a *New York Times Magazine* article that received wide distribution. But Mr. Tufenkian testified that he does not read the *New York Times* and never saw the article before this litigation began.

In sum, although images of the Prado design were disseminated, distribution was not so broad that Mr. Tufenkian was likely to have encountered it. This conclusion is reinforced by the fact that while Mr. Tufenkian's Eclipse design was featured in advertisements and editorials in magazines such as *Elle Decor, Architectural Digest,* and *Interior Design* beginning in the fall of 2001 (Tr. at 232–34; Def. Exh. CCCC), Mr. Nicholls did not come across it until he first discovered Total Eclipse in December 2003. (Tr. at 207–08).

A final piece of evidence that rebuts any inference of access is the letter sent by Mr. Tufenkian's counsel in response to Mr. Nicholls' initial charge of infringement. (Pl.Exh. 58). Mr. Nicholls cites this letter as an admission by Mr. Tufenkian that the designs are similar, an issue that will be addressed below. But it is also relevant to the question of copying, since it would be curious indeed if Mr. Tufenkian, knowing that he had copied Prado when he designed Eclipse, would nevertheless authorize his lawyer to write a letter suggesting that the designs were similar.

### 2. *Probative Similarity*

 Access alone, of course, would not demonstrate copying if the alleged infringer's work did not resemble the copyrighted work. Therefore, to establish an inference of copying, the plaintiff must prove similarity as well as access. Similarity in this context is often characterized as "probative similarity" and must be distinguished from the "substantial similarity" necessary to prove infringement. *See Jorgensen,* 351

F.3d at 56; *Odegard,* 963 F.Supp. at 1337. " 'Probative similarity' is a less demanding test than 'substantial similarity,' requiring only that there are similarities between the two works that would not be expected to arise if the works had been independently created." *Odegard,* 963 F.Supp. at 1337 (citations omitted).

 The similarities here—the arrangement of transected circles in a grid pattern—are not so novel that coincidence could reasonably be ruled out. Even if the works in this case did cross the probative similarity threshold, this would not suffice to establish copying. "There is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." *Jorgensen,* 351 F.3d at 56 (citation and quotation marks omitted). Thus, in some cases works are "so strikingly similar as to preclude the possibility of independent creation" such that proof of access is unnecessary. *Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir.1995) (citation and quotation marks omitted). But here, probative similarity is weak at best, and together with the failure to prove access, the consequence is that no inference of copying may be drawn.

### C. *Substantial Similarity*

 Even if there were sufficient evidence of copying, the works at issue are not substantially similar. That there are some differences is, of course, not dispositive. In determining substantial similarity, " '[t]he key ... is ... the similarities rather than the differences.' " *Attia v. Society of the New York Hospital,* 201 F.3d 50, 57 (2d Cir.1999) (quoting *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1093 n. 4 (2d Cir.1977)). This is because " 'no plagiarist can excuse the wrong by showing how much of his work he did not pirate[.]' " *Tufenkian,*

338 F.3d at 132 (quoting *Sheldon v. Metro–Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.1936)).

■ At the same time, one who copies the work of another will avoid liability for infringement to the extent that the new work

> transforms the copied expression into a design that in some respects resembles the original, yet does not actually excerpt ... a more-than-de-minimis protected portion of the original. Such designs may be termed "inexact copies," in recognition of the fact that they alter the prior image yet mimic its structure in some fashion.

*Id.* (footnote omitted). At most, Eclipse and Total Eclipse might be considered inexact copies of Prado. Each design includes a rectangular array of transected circles. However, because these elements, taken individually, are within the public domain, the copyright protection afforded to their selection and arrangement is somewhat thin. *Id.* at 136 & n. 13.

Moreover, Mr. Tufenkian transformed these elements in significant ways in creating Eclipse and Total Eclipse. Where Prado incorporates twenty circles, Eclipse and Total Eclipse include twelve. The circles in Prado are smaller, creating more of a sense that they are independent of the background than is true of Mr. Tufenkian's works. The transections of the circles in Prado are all proportional—each circle is divided approximately one-quarter/three-quarters—while the circles in Eclipse and Total Eclipse are transected in varying proportions and sometimes more than once. And, while the rows and columns of circles in Prado are evenly spaced, there is a slight asymmetry to the spacing between the columns in the Tufenkian designs.

> Where, as here, a defendant's work is dissimilar in the very respects in which it is claimed to be similar, that can obviously influence the conclusion as to whether the claimed similarity in fact exists or is substantial. Furthermore, dissimilarity in realization or expression can make clear, as it does in this case, that the similarity extends only to unprotectible concepts or ideas.

*Attia,* 201 F.3d at 58.

Of course, "while the infringement analysis must *begin* by dissecting the copyrighted work into its component parts in order to clarify precisely what is not original, infringement analysis is not *simply* a matter of ascertaining similarity between components viewed in isolation." *Tufenkian,* 338 F.3d at 134. Rather, the court must also determine whether a defendant has co-opted the total concept and feel of the original work. *Id.* at 134–35. That is not the case here. The distinctions described above create very different aesthetics. Prado conveys a cool, highly structured, architectural feel. Eclipse and Total Eclipse, on the other hand, are, to the sympathetic viewer, warmer and more casual, while the critic might call them jumbled or off-balance. These distinctions in total feel are exacerbated by elements that are not common to both parties' designs. For example, the greater number of colors used in the Eclipse and Total Eclipse and their more random arrangement create a greater sense of warmth. Similarly, the "magic tape" effect enhances the casual feel of the Tufenkian designs, while the unique framing elements in Prado emphasizes its structure. Because the rectangular "magic tape" elements in Total Eclipse extend the entire width of the carpet and so do not transect any circles vertically, that design is "closer" to Prado than is Eclipse. Nevertheless, it is not substantially similar either in relation to protectable elements or in its overall feel.

As noted above, Mr. Nicholls relies on the defendants' response to his cease and

desist letter as an admission that the designs are similar. (Pl.Exh. 58). It is no such thing. The responsive communication simply points to a presumed chronology of the creation of the respective works and suggests that *if* they could be considered similar, then it is Mr. Nicholls who would be in legal jeopardy. The communication at issue makes no positive assertion of similarity.

## D. *Independent Creation*

 Finally, even if Mr. Nicholls had established access and substantial similarity, the defendants can rebut the inference of copying by proof of independent creation. *See Three Boys Music*, 212 F.3d at 486; *Silberstein v. FOX Entertainment Group, Inc.*, No. 02 Civ. 1131, 2004 WL 1620895, at *8 (S.D.N.Y. July 19, 2004); *Odegard*, 963 F.Supp. at 1336. But because Mr. Nicholls argues that the defendants never pled independent creation, a threshold question arises whether it is an affirmative defense. At least two circuits have held that it is not. Both the Fourth and Eleventh Circuits have found that proof of independent creation merely negates evidence of copying and is not an affirmative defense that relies upon factors extrinsic to the plaintiff's claim. *See Calhoun v. Lillenas Publishing*, 298 F.3d 1228, 1230 n. 3 (11th Cir.2002); *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065–66 (4th Cir.1988). However, other circuits, including the Second Circuit, treat independent creation as an affirmative defense. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 459–60 (6th Cir.2001); *Procter & Gamble Co. v. Colgate–Palmolive Co.*, 199 F.3d 74, 77 (2d Cir.1999); *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997). Therefore, the defendants should have included this defense in their responsive pleading.

 In general, if a party fails to raise an affirmative defense in its pleadings, the defense is waived. *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520, 526 (2d Cir.2004). Nevertheless, Rule 15(b) of the Federal Rules of Civil Procedure permits amendment of the pleadings to conform to evidence presented at trial. Thus, "[e]ven as late as trial, if evidence relating to an unpleaded affirmative defense is introduced without objection, Rule 15(b) requires the pleadings to be treated as if they actually had raised the defensive issue." 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1278 (3d ed.2004) at 679 (footnote omitted); *see also Bradford Audio Corp. v. Pious*, 392 F.2d 67, 73–74 (2d Cir.1968) (defense of official immunity not pled but tried with implied consent of the parties); *George A. Fuller Co. v. Alexander & Reed Esqs.*, 760 F.Supp. 381, 385 (S.D.N.Y.1991).

 In this case, there is no doubt that both parties understood that they were trying the defense of independent creation. At the first trial before Judge Pauley, counsel for the defendants alluded to the defense in his opening statement and presented extensive testimony on this issue. (Tr1. at 26, 35, 241–53). Indeed, Judge Pauley instructed the jury on this issue without objection. (Tr1. at 468). At the trial before me, defense counsel again addressed independent creation in his opening (Tr. at 21–26), and he again introduced evidence supporting that defense. (Tr. at 240–51). And, while plaintiff's counsel objected to specific exhibits of which he had not received adequate notice, he did not object to consideration of independent creation generally. Thus, the plaintiff impliedly consented to trial of this issue, and he has not been prejudiced. Accordingly, the answer is deemed amended to conform to the evidence by incorporating the defense of independent creation.

The testimony presented by Mr. Tufenkian at trial on this issue was persuasive. He presented a coherent picture of the evolution of his thinking that resulted in Eclipse and Total Eclipse. Precursors of these designs such as Pasha Smoke (Def. Exhs. CC & DD) and Stripe Rag Flag (Def. Exhs. EE & FF) embody the concepts of transecting geometric figures including circles and of overlaying the figures with the "magic tape" effect. While the plaintiff rightly points out that these designs have less superficial similarity to Eclipse and Total Eclipse than does Prado, this is simply the result of the grid pattern common to Prado and to the accused works. That does not undercut Mr. Tufenkian's testimony with respect to how he developed his designs.

Moreover, Mr. Tufenkian's testimony was corroborated by that of Ms. Artinian, who described the process of reducing Mr. Tufenkian's concepts to computer renderings. By the time of trial, Ms. Artinian was no longer employed full-time by the defendants (Tr. at 298–99), and although she had done some free lance work for them (Tr. at 310–11), any personal interest she may have had in the litigation was extremely attenuated. The only significant inconsistency between her testimony and that of Mr. Tufenkian related to the time it took to design Eclipse: she testified that she worked on the project for only a day (Tr. at 311), while Mr. Tufenkian described a design process lasting much longer. (Tr. at 240–45, 322–28). But this disparity is easily explained by their different roles. Although Ms. Artinian was involved in the final and most tangible aspect of the design process, Mr. Tufenkian had previously worked through a series of conceptual iterations before he presented her with sketches from which they drafted the final product together. Thus, there is ample evidence of independent creation that has not been effectively rebutted.

*Conclusion*

For the foregoing reasons, I find that the plaintiff has failed to demonstrate access or substantial similarity and that, in any event, the defendants have established independent creation. Accordingly, the plaintiff has not demonstrated that the Eclipse or Total Eclipse designs infringe his copyright for the Prado design. The Clerk of Court shall therefore enter judgment in favor of the defendants dismissing the complaint.[6]

SO ORDERED.

---

**6.** Prior to the first trial, the plaintiff had made a motion for a preliminary injunction, and Judge Pauley had consolidated that motion with the trial on the merits. Accordingly, that motion is now denied.