12-3448-cv (L)
Zalewski v. Cicero Builder Dev., Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: January 15, 2014          Decided: June 5, 2014)

Docket Nos. No. 12-3448-cv, No. 12-3450-cv, No. 12-5127-cv

_____

JAMES E. ZALEWSKI, DRAFTICS, LTD.,

*Plaintiffs-Appellants,*

—v.—

CICERO BUILDER DEV., INC., LUIGI CICERO, T.P. BUILDERS, INC.,THOMAS
PAONESSA, CILLIS BUILDERS, INC., THEODORE CILLIS, III, DERAVEN
DESIGN & DRAFTING, ROXANNE K. HELLER, V.S. SOFIA ENGINEERING,
SOFIA ENGINEERING, PLLC, VINCENZO S. SOFIA,

*Defendants-Appellees.* \*

_____

Before:

KATZMANN, *Chief Judge*, WESLEY and LOHIER, *Circuit Judges*.

_____

---

\* The Clerk of the Court is respectfully directed to amend the official caption as set forth
above.

Appeal from orders and judgments of the United States District Court for the Northern District of New York (Sharpe, *Judge*). Plaintiff alleged copyright infringement and violations of the Digital Millennium Copyright Act against numerous Defendants involved in the construction and sale of houses built with architectural plans allegedly copied from Plaintiff's designs. The district court dismissed Plaintiff's claims against some Defendants, granted summary judgment in favor of the remaining Defendants, and granted attorney's fees to two Defendants for costs incurred defending against Plaintiff's first and second amended complaint. For the reasons stated below, the orders and judgments of the district court are **AFFIRMED** in part, and **VACATED** and **REMANDED** in part.

_____

LEE PALMATEER, Lee Palmateer Law Office LLC, Albany, NY, *for Plaintiffs-Appellants*.

Paul C. Rapp, Monterey, MA, *for Defendants-Appellees Cicero Builder Dev., Inc. and Luigi Cicero*.

AUTONDRIA MINOR (Arlen L. Olsen, *on the brief*), Schmeiser Olsen & Watts LLP, Latham, NY, *for Defendants-Appellees T.P. Builders, Inc., and Thomas Paonessa*.

GEORGE J. SZARY, DeGraff, Foy & Kunz, Albany, NY, *for Defendants-Appellees Cillis Builders, Inc., and Theodore Cillis, III*.

ANNETTE I. KAHLER, (Susan E. Farley, *on the brief*), Heslin Rothenberg Farley & Mesiti, Albany, NY, *for Defendants-Appellees DeRaven Design & Drafting and Roxanne K. Heller*.

KEVIN R. VAN DUSER, Sugarman Law Firm LLP, Syracuse, NY, *for Defendants-Appellees V.S. Sofia Engineering, Sofia Engineering, PLLC, and Vincenzo S. Sofia*.

_____

WESLEY, *Circuit Judge*:

This case calls on us to explore the limits of copyright protection for architectural works. Plaintiffs-Appellants are James Zalewski, an architect, and Draftics, Ltd., the company through which he does business (collectively "Zalewski" or "Plaintiff"). Zalewski asserts that he created and then licensed numerous designs for colonial homes to two construction companies.[1] He alleges that these companies and their contractors infringed his copyright in these designs by using them in ways the licenses did not permit and after the licenses had expired. Zalewski also asserts that Defendants' actions violated the Digital Millennium Copyright Act ("DMCA"). Defendants principally contend that their designs do not copy the protected elements of Plaintiff's designs.

The district court dismissed portions of Plaintiff's complaint and granted summary judgment to Defendants on the remaining claims. The court also granted two Defendants' motions for attorney's fees. Plaintiff now challenges the dismissal of his complaint, the grant of summary judgment to Defendants, the denial of summary judgment to him, and the award of attorney's fees. We **AFFIRM** the district court, in part, holding that (1) any copying of Plaintiff's

---

[1] The parties do not discuss the precise terms under which Plaintiff provided his

3

designs extended only to unprotected elements of his works, and (2) Plaintiff failed to plead a violation of the DMCA. We also **VACATE**, in part, holding that the district court applied the incorrect legal standard in awarding attorney's fees, and **REMAND** for the district court to apply the correct standard.

## BACKGROUND

In the 1990s, Plaintiff James Zalewski was self-employed as an architect doing business through the firm Draftics, Ltd. During this period, he granted Defendants T.P. Builders ("T.P.")[2] and Cillis Builders ("Cillis")[3] licenses to use several colonial home designs he had created. According to Zalewski, after the licenses expired, T.P. hired Defendant V.S. Sofia Engineering ("Sofia")[4] and Defendant DeRaven Design & Drafting ("DeRaven")[5] and Cillis hired DeRaven to customize his designs for their customers and continued marketing his designs, or customized versions thereof, without his consent. Defendant Cicero

---

designs to Defendants.

[2] "T.P." refers to both T.P. Builders and its owner, Thomas Paonessa, who is also a defendant.

[3] "Cillis" refers to both Cillis Builders and its owner, Theodore Cillis, III, who is also a defendant.

[4] "Sofia" refers to both V.S. Sofia Engineering and its owner, Vincenzo Sofia, who is also a defendant.

[5] "DeRaven" refers to both DeRaven Design & Drafting and its owner, Roxanne K. Heller, who is also a defendant.

4

Builders ("Cicero")[6] built two houses using DeRaven designs that were allegedly based on Plaintiff's originals.

Zalewski filed the first of these now consolidated actions in July 2010 in the United States District Court for the Northern District of New York, alleging that Defendants infringed the copyright in his original designs. Zalewski asserts that, in building the homes and customizing the designs, Defendants copied the overall size, shape, and silhouette of his designs as well as the placement of rooms, windows, doors, closets, stairs, and other architectural features. In addition to his copyright infringement claims, Zalewski asserts causes of action under the DMCA, which prohibits, among other things, "intentionally remov[ing] or alter[ing] any copyright management information." 17 U.S.C. § 1202(b).

In his original complaint, Zalewski named as defendants the instant Appellees, along with numerous other defendants including other builders, engineers, architects, real estate agents, and owners of the purportedly infringing homes. Then, between September and December 2010, Zalewski voluntarily dismissed the vast majority of these defendants, and in October 2010, he filed a

---

[6] "Cicero" refers to both Cicero Builder Dev. Inc. and its owner Luigi Cicero, who is also

5

second amended complaint, naming only the instant Defendants.[7] The district court dismissed this complaint in August 2011 but granted leave to file a Third Amended Complaint – the operative complaint.

Following this final complaint, Defendants filed a number of motions to dismiss and motions for summary judgment, *inter alia*, on the ground that the designs they employed or created lacked substantial similarity with Zalewski's. Zalewski cross-moved for summary judgment. Over the next few months the district court sorted through the motions. After allowing some discovery, the court granted judgment to all remaining defendants and denied Zalewski's cross-motion for summary judgment. Still, the court permitted Zalewski to file a fourth amended complaint to more clearly state his DMCA claims. Zalewski passed on the offer and the district court entered final judgment in July 2012.

Finally, in November 2012, the court granted a motion by T.P. and Cicero for expenses and attorney's fees incurred defending against the first three complaints. Zalewski now challenges the partial dismissal of his complaint, the

---

a defendant.

[7] For reasons that are not clear, Plaintiff voluntarily dismissed his original action against Cicero and another defendant not a party to this appeal, only to bring those claims again, in separate actions. Plaintiff's claims against Cicero were then re-consolidated with this action. Dist. Ct. Dkt. No 171.

6

grant of summary judgment in favor of Defendants, the denial his motion for

summary judgment, and the award of attorney's fees.

## DISCUSSION

The Copyright Act, 17 U.S.C. §§ 101 *et seq.,* provides a non-exhaustive list

of categories of artistic works for which protection is available. The statute lists,

for example, "sound recordings," "pantomimes and choreographic works,"

"pictorial, graphic and sculptural works," and "literary works." 17 U.S.C.

§ 102(a). When Congress passed the Copyright Act of 1976, architectural works

were not among the listed categories, and it was not clear to what extent

buildings or architectural plans could be copyrighted. William F. Patry, 2 Patry

on Copyright § 3:109 (2014). In the 1980s, however, Congress started the lengthy

process of updating the Copyright Act in order to join the Berne Convention, an

international agreement that governs copyright protection. *See generally* 7 Patry

on Copyright § 23:45. Among other things, the Berne Convention requires

signatory nations to protect architectural works. *See* 2 Patry on Copyright § 3:107.

Thus, the 1976 Act notwithstanding, the United States was compelled to clarify

that architectural works are protectable under federal law. *Id.* To this end,

Congress passed the Architectural Works Copyright Protection Act of 1990 and

added "architectural works" to the list of protectable material. *Id.*

## A. Copyright Infringement

In order to make out a claim of copyright infringement for an architectural work – or any work – a plaintiff must establish three things: 1) that his work is protected by a valid copyright, 2) that the defendant copied his work, and 3) that the copying was wrongful. *See Arnstein v. Porter*, 154 F.2d 464, 468, 472–73 (2d Cir. 1946); *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 139–41 (2d Cir. 1992). The second and third elements – copying and wrongful copying – are often confused. This confusion is understandable; in many cases *any* copying of a work is wrongful, and thus there is often no need to draw the distinction.[8] Nonetheless, the distinction can be important. Not every portion or aspect of a copyrighted work is given copyright law's protection. Copying these aspects of a work is not wrongful, and thus not *all* copying is wrongful.

An example is helpful. Suppose a particular law professor has never met any of my law clerks and has never read any of their numerous law review articles.[9] If that professor independently composes a paragraph, which, *by*

---

[8] *De minimis* copying is not actionable. *Ringgold v. Black Entm't T.V. Inc.*, 126 F.3d 70, 75 (2d Cir. 1997).

[9] Gregory M. Dickinson, *Calibrating* Chevron *for Preemption*, 63 Admin. L. Rev. 667 (2011); Gregory M. Dickinson, *An Empirical Study of Obstacle Preemption in the Supreme Court*, 89 Neb. L. Rev. 682 (2011); Gregory M. Dickinson, note, *An Interpretive Framework*

*coincidence*, is very similar to – or indeed identical with – a paragraph from one of their articles, the professor need not fear copyright liability. Even though the works are similar, the professor has not copied, and, therefore, element two of the infringement cause of action – actual copying – is not satisfied. Independent creation is a defense to copyright infringement. *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 765–66 (2d Cir. 1991).

Likewise, one of my clerk's articles may contain a lengthy quotation from a court opinion. The article is copyrighted, but the court opinion is in the public domain.[10] A subsequent author may copy the language from the court opinion

*for Narrower Immunity Under Section 230 of the Communications Decency Act*, 33 Harv. J.L. & Pub. Pol'y 863 (2010); Gregory M. Dickinson, recent development, Chevron*'s Sliding Scale in* Wyeth v. Levine, 33 Harv. J.L. & Pub. Pol'y 1177 (2010); Jonathan Feingold & Douglas Souza, *Measuring the Racial Unevenness of Law School*, 15 Berkeley J. Afr.-Am. L. & Pol'y 71 (2013); Jonathan Feingold & Karen Lorang, *Defusing Implicit Bias*, 59 UCLA L. Rev. Discourse 210 (2012); Jonathan Feingold, *Racing Towards Color-blindness: Stereotype Threat and the Myth of Meritocracy*, 3 Geo. J.L. & Mod. Critical Race Persp. 231 (2011); Kate Klonick, *Comparing Apples to Applejacks: Cognitive Science Concepts of Similarity Judgment and Derivative Works*, 60 J. Copyright Soc'y U.S.A. 365 (2013); Kate Klonick, *Not in My Atlantic Yards: Examining Netroots' Role in Eminent Domain Reform,* note, 100 Geo. L.J. 263 (2011); Nicholas T. Matich, *Patent Office Practice After the America Invents Act*, 23 Fed. Cir. B.J. 225 (2013); Nicholas T. Matich & Dotan Oliar, *Copyright Preregistration: Evidence and Lessons from the First Seven Years, 2005–2012*, 55 Ariz. L. Rev. 1073 (2013); Nicholas T. Matich, note, *Forum Domination: Religious Speech in Extremely Limited Public Fora*, 98 Va. L. Rev. 1149 (2012).

[10] Broadly, the "public domain" refers to all works, or elements thereof, that are not subject to copyright protection. Most commonly, the public domain refers to works that are sufficiently old that their copyright term has expired. *See* 17 U.S.C. §§ 301– 305.

directly out of the article without infringing my clerk's copyright. This second author will have copied from my clerk, but not wrongfully. He took only what was in the public domain and therefore unprotected. *See Arnstein*, 154 F.2d at 472–73. In this example, element two – copying – is satisfied, but element three – wrongful copying – is not.

Confusion between elements two and three arises because a close similarity between two works is often relevant to proving both actual copying and wrongful copying. Obviously, if two paragraphs are identical, a reasonable inference is that the second paragraph was copied from the first. If the copied paragraph contains only protected material, then this similarity is also strong evidence that the copying was wrongful. Thus, in the first example above, the professor independently created a paragraph identical to my clerk's, but given the striking similarity between the paragraphs, we might be forgiven for thinking that the professor copied, and copied wrongfully.[11]

---

Works of the United States government, like court opinions, are also in the public domain. *Id*. § 105.

[11] Fortunately for the good professor, most authors publishing in law reviews assign their copyright to the journal. My clerks are a skeptical and litigious bunch. If they still held copyright in their articles, they most likely would not believe the professor's protestations of innocence, and would promptly serve him with a summons and complaint.

When an original work contains many *un*protected elements, however, a close similarity between it and a copy may prove only copying, not wrongful copying. This is because the similarity may derive only from these unprotected elements. For clarity, the term "substantial similarity" is properly reserved for similarity that exists between the protected elements of a work and another work. If two works are "substantially similar," any copying was wrongful. *See Laureyssens*, 964 F.2d at 140. By contrast, similarity that relates to unprotected elements is probative only of copying – not wrongful copying – and is referred to as "probative similarity." *Id.* (internal quotation marks omitted).

In this case, there is no dispute that Plaintiff's copyrights are valid (element one). There is also substantial evidence that Defendants copied from Plaintiff's designs. Defendants possessed copies of Plaintiff's designs, and there are very strong resemblances between those designs and Defendants' final product (probative similarity going to element two). Accordingly, granting summary judgment to Defendants on these elements would be inappropriate. This case turns on element three, wrongful copying. Here, even assuming Defendants copied, they took only the unprotected elements of Plaintiff's work.

11

Any copying was not wrongful and the district court correctly granted summary

judgment.[12]

### 1. Substantial Similarity and Wrongful Copying

To determine whether two works are substantially similar – and thus

whether any copying was wrongful – we usually apply the "ordinary observer"

test and ask whether "the ordinary observer, unless he set out to detect the

disparities, would be disposed to overlook them, and regard their aesthetic

appeal as the same." *Laureyssens*, 964 F.2d at 141 (internal quotation marks

omitted). Often, however, a work's aesthetic appeal will be due largely to

unprotected elements. In these cases, we "must be more discerning, [and]

ignor[e] those aspects of a work that are unprotectable" as we apply the test, lest

we conflate mere copying with wrongful copying. *Id.* (internal quotation marks

---

[12] As always, we review dismissals for failure to state a claim and grants of summary judgment *de novo*. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 63–64 (2d Cir. 2012). We have frequently said that because substantial similarity is a fact-intensive question, it is generally an issue reserved for a jury. Nonetheless, "we have recognized that a court may determine non-infringement as a matter of law[,] . . . either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (emphasis and internal quotation marks omitted).

omitted). Here, there is no doubt that Plaintiff's designs, although copyrightable, are replete with uncopyrightable elements.

What aspects of Zalewski's designs are protectable? A fundamental rule of copyright law is that it protects only "original works of authorship," those aspects of the work that originate with the author himself. 17 U.S.C. § 102(a). Everything else in the work, the history it describes, the facts it mentions, and the ideas it embraces, are in the public domain free for others to draw upon. It is the peculiar *expressions* of that history, those facts, and those ideas that belong exclusively to their author. *See* 17 U.S.C. § 102(b). Thus, any author may draw from the history of English-speaking peoples, but no one may copy from *A History of the English-Speaking Peoples*.[13] Any artist may portray the Spanish Civil War, but no one may paint another *Guernica*.[14] And anyone may draw a cartoon mouse, but there can be only one Mickey.[15]

---

[13] *A History of the English-Speaking Peoples* is a four-volume history written by Sir Winston S. Churchill.

[14] *Guernica* is a painting by Pablo Picasso depicting the bombing of the Basque village Guernica during the Spanish Civil War.

[15] Of course, copyright protection for works by Churchill, Picasso, Disney, and every other artist last only as long as the limited term Congress grants. *See* U.S. Const. art. I, § 8, cl. 8 (permitting congress to "secur[e] *for limited Times* to Authors and Inventors the exclusive Right to their respective Writings and Discoveries") (emphasis added); 7 U.S.C. §§ 301– 305 (setting the terms for copyrights).

Numerous doctrines separate protectable expression from elements of the public domain. For example, the doctrine of "scènes-à-faire" teaches that elements of a work that are "indispensable, or at least standard, in the treatment of a given topic" – like cowboys, bank robbers, and shootouts in stories of the American West – get no protection. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980). Similarly, the "merger doctrine" instructs that some ideas can only be expressed in a limited number of ways – single words or colors for example. When expression is so limited, idea and expression "merge." Expressions merged with ideas cannot be protected, lest one author own the idea itself. *Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir. 1967).

The central question of this case is how to apply these and related doctrines to separate the protectable from the unprotectable in architectural works. Defendants urge us to chart a different course. They view Plaintiff's designs as a compilation of various architectural features that individually and collectively do not merit copyright protection. They rely on the Eleventh Circuit case of *Intervest Construction, Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008), and the Supreme Court's doctrine governing "compilations" set out in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 348 (1991).

14

In *Feist*, plaintiff asserted a copyright in its telephone book. *Feist*, 499 U.S. at 344. Although the book was comprised of individually un-copyrightable facts – people's phone numbers – plaintiff argued that the compilation and arrangement of those facts should nonetheless be copyrightable to protect its investment in creating the phonebook. *Id*. If its work could be freely appropriated, plaintiff argued, there would be no incentive to create similar works in the future. *Id*. at 353. The Supreme Court rejected this argument and held that a copyright could subsist in an arrangement of individually un-copyrightable elements, but emphasized that the Copyright Act requires works to be "original." *Id*. at 358; *see also* 17 U.S.C. § 102(a). Thus, in order for a compilation or arrangement to be worthy of copyright protection, *the arrangement itself* must be original. The Supreme Court held that standard compilations, like the *Feist* plaintiff's alphabetical listing, get no protection.

In *Intervest*, the Eleventh Circuit applied this doctrine to architecture. It held that all copyrighted works are either "creative, derivative, [or] compiled," that is original, variations on an original, or compilations of unoriginal material. *Intervest*, 554 F.3d at 919 n.3. According to *Intervest*, each kind of work gets varying levels of protection. *Id.* The court then relied on the similarity between the statutory definitions of "compilation" and "architectural work" to conclude

15

that architectural works fall into the "compiled" category, and are thus entitled to only a "thin" copyright based solely on their "arrangement and coordination" of unoriginal and uncopyrightable elements. 554 F.3d at 919. On facts similar to those here, the *Intervest* court held that any copying of the plaintiff's house designs went only to standard architectural features arranged in standard ways. In other words, any copying was not wrongful. *Id*.

While we agree with the outcome in *Intervest*, we disagree with its reasoning. "Creative," "derivative," and "compiled" may be useful concepts in some cases, but we reject the idea that works always fall neatly into one of these categories. Every kind of work at some level is a compilation, an arrangement of uncopyrightable "common elements." *Id*. No individual word is copyrightable, but the arrangement of words into a book is. No color is copyrightable, but the arrangement of colors on canvas is. Likewise, doors and walls are not copyrightable, but their arrangement in a building is. Some architectural designs, like that of a single-room log cabin, will consist solely of standard features arranged in standard ways; others, like the Guggenheim, will include standard features, but also present something entirely new. Architecture, in this regard, is like every art form.

16

Moreover, we see little support in the statute for *Intervest's* use of

categories. Although the statutory definitions of "compilations" and

"architectural works" both speak of an "arrangement" or "to arrange" and refer

to "standard features" or "preexisting material," architectural works and

compilations are not the only works that are defined with reference to their

discrete – and perhaps uncopyrightable – elements. 17 U.S.C. § 101.[16]  For

example, the statute defines "Literary works" as "words, numbers, or other . . .

symbols" arranged in "books, periodicals" or other media; "Sound Recordings"

as "a series of musical, spoken, or other sounds"; a "computer program" as "a set

of statements or instructions"; and "Motion Pictures" and "Audio Visual works"

as  "series of related images." 17 U.S.C. § 101. As we have explained, the merger

doctrine will often render these discrete elements un-copyrightable. *Softel v.*

*Dragon Med. & Scientific Commc'ns*, 118 F.3d 955, 964 (2d Cir. 1997) (explaining

---

[16] Additionally, the definitions of "architectural work" and "compilation" have little else in common. The statute defines an "architectural work" as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.  A "compilation" is a "work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." *Id*.

that "the words that constitute a literary work are not copyrightable, yet . . . a collection of words" may be).[17]

Labeling architecture a compilation obscures the real issue. Every work of art will have some standard elements, which taken in isolation are un-copyrightable, but many works will have original elements – or original arrangements of elements. The challenge in adjudicating copyright cases is not to determine whether a work is a creative work, a derivative work, or a compilation, but to determine what in it originated with the author and what did not. *Intervest* fails to do this. It compares the floor plans of the two houses, "focusing only on the narrow arrangement and coordination" of what it deems "standard . . . features" and intuits that there was no copying of the arrangement. 554 F.3d at 921. But it fails to provide any analysis of what made a feature "standard" and unprotectable. Hence, we find it of little assistance here.

---

[17] The legislative history also supports this view. When Congress added architectural works to the list of copyrightable subject matter, it made clear that it wanted architectural works analyzed no differently than other works and differentiated between architectural works that present "original design elements" and those that do not. H.R. Rep. No. 101–735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6952. *Intervest* contravenes Congress' intent by treating architectural works differently than other works and failing to determine what in architecture – beyond mere arrangement – is copyrightable.

Courts should treat architectural copyrights no differently than other copyrights. This is what Congress envisioned, and it is an approach we have employed before. H.R Rep. No. 101–735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951. In *Attia v. Society of the New York Hospital*, 201 F.3d 50 (2d Cir. 1999), for example, the plaintiff had been retained by New York Hospital to design an expansion of its facility over FDR Drive. The hospital rejected his preliminary sketches, but ultimately went with a similar design by another firm. The plaintiff admitted that his drawings were "preliminary and generalized" "outline[s]" of "concepts." *Id*. at 55–56. Although there were some similarities between the plaintiff's and the defendant's designs, there were also significant differences. Thus, we held that any copying went to unprotected ideas, "concepts," rather than concrete expression. *Id.*

In *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 68 (2d Cir. 2010), on a similar set of facts, we held that copying of "architecture that was light, airy, [and] transparent," as well as design parameters and "generalized notions of where to place functional elements," went only to ideas and not protected expression. Finally, in *Sparaco v. Lawler, Matusky, Skelly, Engineers LLP*, 303 F.3d 460, 468–69 (2d Cir. 2002), we held that although a construction site preparation plan was preliminary in the sense that it pertained

19

to the early phases of construction, it was extremely detailed and thus more than a mere idea.

Determining the boundaries of copyright protection in non-traditional areas of creative expression, like architecture, is not something new. A number of our cases have applied copyright doctrines in other unusual contexts. In *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992), for example, we had to determine for the first time what elements of a computer program are protectable. To do so, we simply applied the usual copyright doctrines of merger, public domain, and scènes-à-faire to these new circumstances. *Id.* at 707. For example, we held that the merger doctrine would apply when "efficiency concerns . . . so narrow the practical range of [coding options] as to make only one or two forms of expression workable . . . ." *Id.* at 708. Similarly, we applied the doctrine of scènes-à-faire because "in many instances it is virtually impossible to write a program . . . without employing standard techniques." *Id.* at 709 (internal quotation marks omitted). Consequently, we held that coding dictated by mechanical specifications, industry design standards, market demands, and usual programing practices also did not get copyright protection. *Id.* at 710.

All of these principles apply equally well to architecture. Efficiency is an important architectural concern. Any design elements attributable to building codes, topography, structures that already exist on the construction site, or engineering necessity should therefore get no protection.

There are scènes-à-faire in architecture. Neoclassical government buildings, colonial houses, and modern high-rise office buildings are all recognized styles from which architects draw. Elements taken from these styles should get no protection. Likewise, there are certain market expectations for homes or commercial buildings. Design features used by all architects, because of consumer demand, also get no protection.

Our prior architecture cases support this approach. In *Sparaco*, we held that there can be no copyright in a plan insofar as it merely represents the topography of a building site. 303 F.3d at 467. Topography is an un-copyrightable "fact."[18] In *Attia* we recognized that "generalized notions of where

---

[18] We do not doubt that topography will often inspire, or indeed require, original architectural solutions that will be worthy of copyright. Frank Lloyd Wright's *Fallingwater* is a prominent example. There may also be original ways of representing existing topography. The topography itself, however, is uncopyrightable. If two architects submit competing bids for the same project, one cannot assert that the other's design infringed his copyright because their designs include reference to the same topography or share similarities dictated by that topography. One expects competent

to place functional elements, how to route the flow of traffic, and . . . methods of construction" are un-protectable. 201 F.3d at 55. Architects cannot claim that good engineering is original to them – or at least can get no copyright protection for it.[19] Finally, in *Gaito Architecture*, we held that there is no copyright in a building plan's design parameters. 602 F.3d at 68. Constraints placed on an architect by the way her client plans to use the building do not originate with the architect.

## 2. The Instant Plans

After considering these principles and reviewing the designs in question, we conclude that even if Defendants copied Zalewski's plans, they copied only the unprotected elements of his designs. Plaintiff's principal argument is that Defendants' designs are so close to his that Defendants must have infringed. He is correct that the designs are, in many respects, quite close, but this is not enough. It proves at most copying, not wrongful copying.

---

architects to accurately represent a construction site.

We note that this only applies to *existing* topography, however, because existing topography is an uncopyrightable fact. An architect may be able to copyright his original proposals for alterations to the topography. On the other hand, such alterations may be dictated by good engineering practice or a customer requirement, in which case they may not be copyrightable. We leave exploration of these issues to future cases.

22

First, many of the similarities are a function of consumer expectations and standard house design generally. Plaintiff can get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen walls. Furthermore, the overall footprint of the house and the size of the rooms are "design parameters" dictated by consumer preferences and the lot the house will occupy, not the architect. *See Gaito*, 602 F.3d at 68.

Finally, most of the similarities between Plaintiff's and Defendants' designs are features of all colonial homes, or houses generally. So long as Plaintiff was seeking to design a colonial house, he was bound to certain conventions. He cannot claim copyright in those conventions. Great artists often express themselves through the vocabulary of existing forms. Shakespeare wrote his Sonnets; Brahms composed his *Hungarian Dances*; and Plaintiff designed his colonial houses. Because we must preserve these forms for future artists, neither iambic pentameter, nor European folk motifs, nor clapboard siding are copyrightable.

---

[19] The functional aspects of a work are governed by patent law, not copyright law. *See Baker v. Selden*, 101 U.S. 99, 104 (1879).

23

Plaintiff makes no attempt to distinguish those aspects of his designs that were original to him from those dictated by the form in which he worked. For example, Zalewski claims that the "front porches are the same design, size, and in the same location." Reply Br. 6. But a door centered on the front of the house is typical of many homes, and colonials in particular.[20] Moreover, there are subtle differences in the paneling, size, and framing of Plaintiff's and Defendants' doors. These differences are not great, but given the constraints of a colonial design, they are significant. The same is true of the windows and garage doors that Plaintiff claims are identical. They are quite similar in location, size, and general design, but again, the similarities are due primarily to the shared colonial archetype. The window panes, shutters, and garage-door paneling all have subtle differences. Likewise, the designs' shared footprint and general layout are in keeping with the colonial style. There are only so many ways to arrange four

---

[20] Defendants have helpfully included in the record excerpts from several treatises, which describe the basics of colonial architecture. *See, e.g.*, Virginia McAlester & Lee McAlester, A Field Guide to American Houses (1984); Henry Lionel Williams & Ottalie K. Williams, Old American Houses 1700 to 1850: How to Restore, Remodel, and Reproduce Them (1957). The features of prominent architectural styles, particularly of home designs, are matters with which we are familiar and of which we can take judicial notice. Fed. R. Ev. 201. Although Plaintiff insists that his houses are not in the colonial style, he offers no argument or evidence on this point, merely assertion. We find these assertions incredible. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

24

bedrooms upstairs and a kitchen, dining room, living room, and study downstairs. Beyond these similarities, Plaintiff's and Defendants' layouts are different in many ways. The exact placement and sizes of doors, closets, and countertops often differ as do the arrangements of rooms.

Although he undoubtedly spent many hours on his designs, and although there is certainly something of Plaintiff's own expression in his work, as long as Plaintiff adhered to a pre-existing style his original contribution was slight – his copyright very thin. Only very close copying would have taken whatever actually belonged to Plaintiff. *See Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71 (2d Cir. 1999). Copying that is not so close would – and in this case did – only capture the generalities of the style in which Plaintiff worked and elements common to all homes. Defendants' houses shared Plaintiff's general style, but took nothing from his original expression.

## B. Plaintiff's Digital Millennium Copyright Act Claim

In addition to his copyright infringement claim discussed above, Plaintiff appears to bring several other claims, the nature of which is not clear. The DMCA prohibits, among other things, "intentionally remov[ing] or alter[ing] any copyright management information," such as the familiar © copyright notice. 17 U.S.C. § 1202(b).  In places, Plaintiff obliquely suggests that Defendants

25

"removed" the copyright notices from his work, apparently by making photocopies of his drawings and omitting the copyright notices in the process. Regardless of whether we construe this vague assertion as a DMCA claim or a copyright infringement claim, it was properly dismissed on summary judgment because it had no support in the record and was never adequately alleged, despite the district court offering Plaintiff an opportunity to amend his complaint to clearly allege photocopying and removal of copyright management information from supposedly photocopied works. Since Plaintiff failed to plead his DMCA claims or provide any evidentiary support for them, contradicts portions of the DMCA claims in his brief, and passed up an opportunity to clarify his complaint, we affirm the district court's dismissal of those claims on summary judgment.

## C. Attorney's Fees

Finally, Plaintiff appeals the district court's award of attorney's fees to T.P. and DeRaven under § 505 of the Copyright Act. We review an award of attorney's fees for reasonableness "in terms of the circumstances of the particular case, and the district court's determination will be reversed on appeal only for an abuse of discretion." *Matthew Bender & Co., v. West Publ'g. Co.*, 240 F.3d 116, 121 (2d Cir. 2001) (quoting *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d

26

Cir. 1999)). "[T]his Court may reverse an award of attorney['s] fees if the district court applied the wrong legal standard . . . , or [made] a clearly erroneous assessment of the evidence." *Id*. (internal quotation marks omitted).

The Copyright Act provides courts with the discretion to award reasonable attorney's fees to a prevailing party. *See* 17 U.S.C. § 505. Although "[t]here is no precise rule or formula" that district courts must apply in determining whether to award attorney's fees, the Supreme Court has suggested a list of non-exclusive factors that courts may consider: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994) (internal quotation marks omitted). Of these factors, "objective reasonableness . . . should be given substantial weight in determining whether an award of attorney['s] fees is warranted" because "the imposition of a fee award against a copyright holder with an objectively reasonable litigation position will generally not promote the purposes of the Copyright Act." *Matthew Bender*, 240 F.3d at 122.

The district court concluded that, while Zalewski's Third Amended Complaint was objectively reasonable, his first three complaints were objectively

27

unreasonable because they "were strewn with legal conclusions and lacked sufficient factual bases to survive [D]efendants' motions to dismiss," and they had improperly named dozens of defendants who "bore no culpability," which "ultimately complicated the litigation." While the district court may have been correct that the initial complaints and Zalewski's decision to name nearly ninety defendants, including the current owners of the allegedly infringing homes, were ill-advised, these deficiencies do not make the bringing of this action "objectively unreasonable." Indeed, the district court's finding that Zalewski's Third Amended Complaint was objectively reasonable — that is, had a reasonable basis in law and fact — seems logically inconsistent with finding that the prior complaints, which set out the same basic claims, were objectively unreasonable. Moreover, the sanction imposed here—an award of attorney's fees to T.P. and DeRaven, defendants against whom the district court found Zalewski's claims to be reasonable—is poorly matched to the deficiencies identified by the district court. To the extent that the district court relied on a finding of objective unreasonableness, such a finding on the facts of this case is not "faithful to the purposes of the Copyright Act." *Fogerty*, 510 U.S. at 534 n.19.

However, it appears that Zalewski's initial conduct might warrant an award of attorney's fees under the Copyright Act based on other factors. *See, e.g.,*

28

*Matthew Bender*, 240 F.3d at 126 ("Misconduct before or during litigation can, in appropriate cases, provide the basis for an award of fees."). The district court may also be able to explain why in its view the first three complaints were so obtuse, abusive, and otherwise different from the Third Amended Complaint that its award is justified. Therefore, we vacate the district court's award of attorney's fees to T.P. and DeRaven and remand for reconsideration of whether an award of attorney's fees is appropriate in light of this order.

## CONCLUSION

For the foregoing reasons, the district court's orders of February 22, 2012, dismissing Plaintiff's claims against Cillis, DeRaven, and Sofia, its order of June 18, 2012 granting summary judgment to T.P. and Cicero, and its judgment of July 20, 2012 are **AFFIRMED.** The district court's order and judgment of November 21, 2012, granting attorney's fees to T.P. and DeRaven are **VACATED** and **REMANDED** for reconsideration in light of this order. Appellees outstanding motion is **DENIED** as moot.