In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 19-2716

DESIGN BASICS, LLC, and
CARMICHAEL & DAME DESIGNS, INC.,

*Plaintiffs-Appellants*,

*v.*

SIGNATURE CONSTRUCTION, INC., et al.,

*Defendants-Appellees*.

---

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:16-CV-1275 — **Colin S. Bruce**, *Judge*.

---

ARGUED JANUARY 22, 2020 — DECIDED APRIL 23, 2021

---

Before SYKES, *Chief Judge*, and WOOD and HAMILTON, *Circuit Judges*.

SYKES, *Chief Judge*. Copyright law strikes a practical balance between the intellectual-property rights of authors and the public interest in preserving the free flow of ideas and information and encouraging creative expression, all in furtherance of the constitutional purpose to "promote the Progress of Science and useful Arts." U.S. CONST. art. 1, § 8, cl. 8; *see generally Google LLC v. Oracle Am., Inc.*, 141 S. Ct.

1183, 1195 (2021). Copyright trolls—opportunistic holders of registered copyrights whose business models center on litigation rather than creative expression—disrupt this balance by inhibiting future creativity with negligible societal benefit. "Like the proverbial troll under the bridge, these firms try to extract rents from market participants who must choose between the cost of settlement and the costs and risks of litigation." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1097 (7th Cir. 2017).

Plaintiff Design Basics, LLC, is a copyright troll. *Id.* at 1096–97. The firm holds registered copyrights in thousands of floor plans for suburban, single-family tract homes, and its employees trawl the Internet in search of targets for strategic infringement suits of questionable merit. The goal is to secure "prompt settlements with defendants who would prefer to pay modest or nuisance settlements rather than be tied up in expensive litigation." *Id.* at 1097. As we explained in *Lexington Homes*, "[t]his business strategy is far removed from the goals of the Constitution's intellectual property clause." *Id.* Instead, it amounts to an "intellectual property shakedown." *Id.* at 1096.

This appeal involves yet another Design Basics infringement action, one of more than 100 such suits in the last decade or so. *Id.* at 1097. When Design Basics was last before this court in *Lexington Homes*, we were guided by two well-established copyright doctrines—*scènes à faire* and merger—that constrain the ability of infringement plaintiffs to claim expansive intellectual-property rights in a manner that impedes future creativity. Applying these doctrines, we held that Design Basics' copyright in its floor plans is thin. *Id.* at 1101–05. The designs consist mainly of unprotectable stock elements—a few bedrooms, a kitchen, a great room, etc.—

and much of their content is dictated by functional considerations and existing design conventions for affordable, suburban, single-family homes. When copyright in an architectural work is thin, only a "strikingly similar" work will give rise to a possible infringement claim. *Id.* at 1105. Applying this standard, we held that no reasonable jury could find for Design Basics and affirmed a summary judgment against it. *Id.*

This latest appeal meets the same fate. Design Basics sued Signature Construction, Inc., and related companies, accusing them of copying ten of its registered floor plans for suburban, single-family homes. The district court entered summary judgment for the defendants based largely on the reasoning of *Lexington Homes*.

Design Basics asks us to overrule *Lexington Homes*. We decline to do so. And we take this opportunity to restate and clarify the elements of a prima facie case of infringement, both as a general matter and more particularly in cases involving works of this type in which copyright protection is thin. For this category of claims, only extremely close copying is actionable as unlawful infringement. Put more precisely, this type of claim may move forward only if the plaintiff's copyrighted design and the allegedly infringing design are virtually identical. That standard is not satisfied here, so we affirm.

## I. Background

We described Design Basics' business strategy in *Lexington Homes*; a brief summary will suffice for present purposes. Design Basics holds registered copyrights in thousands of floor plans for suburban, single-family homes. *Lexington Homes*, 858 F.3d at 1096. The plans are not technical

construction drawings. Rather, they are basic schematic designs, largely conceptual in nature, and depict layouts for one- and two-story single-family homes that include the typical rooms: a kitchen, a dining area, a great room, a few bedrooms, bathrooms, a laundry area, a garage, stairs, assorted closets, etc.

More than a decade ago, Patrick Carmichael and Myles Sherman bought Design Basics "as an investment opportunity."[1] *Id.* at 1096. Since then, litigation proceeds have become "a principal revenue stream" for the firm. *Id.* at 1097. Indeed, Design Basics incentivizes its employees to search the Internet for litigation targets by paying a finder's fee—a percentage of net recovery—if they locate a prospective infringement defendant. This is the core of the firm's business model. *Id.*

The firm maintains an easily accessible website displaying 2,847 floor plans. It also regularly sends mass mailings of its designs to members of the National Association of Home Builders. Over the years the firm has sent millions of publications containing its floor plans to home builders. When it initiates litigation, it hopes—indeed, expects—to find these designs in the defendant's files.

This case has its genesis in that business model. In 2014 Paul Foresman, Director of Business Development at Design Basics, emailed Carmichael with the subject line: "A gift for you." Foresman told Carmichael that by using the Internet Archive's Wayback Machine, he discovered that a firm called "Signature Homes" may have copied some of Design Basics' home designs. Carmichael was initially confused

---

[1] Carmichael & Dame Designs, Inc., is named as an additional plaintiff. It has no independent role in this litigation, so we mention it no further.

because Design Basics was *already* asserting infringement claims against a firm by that name, but Foresman clarified that *this* Signature Homes—based in Illinois—was a different company. Pleased with Foresman's discovery, Carmichael wrote back: "Wow very nice gift my friend."

This infringement suit followed. In 2016 Design Basics sued Signature Construction and related companies,[2] alleging that they infringed ten of its floor plans. During discovery, Design Basics learned that Signature's files contained photocopies of four of its plans: "Ainsley," "2461 Shawnee," "2963 Columbus," and "9169 Kempton Court." The photocopies were found in Signature's files for homes labeled "Carlisle," "Lot 119 Lake Falls," "Lot 63 Sommer Place," and "Lot 309 Stonegate," respectively. The photocopy of Design Basics' 2461 Shawnee floor plan had red markings on it, indicating modifications to the plan. John Tanner, a draftsman at Signature, testified that he received the marked-up image from Steve Meid, a Signature partner, and understood that the markings were modifications that Meid wanted him to make.

At the end of lengthy discovery, Signature moved for summary judgment, relying heavily on our ruling against Design Basics in *Lexington Homes*. As we explained in that opinion, under the *scènes à faire* and merger doctrines, Design Basics' copyright protection in its floor plans is thin, *id.* at 1101–05, and therefore only a "strikingly similar" plan would give rise to an infringement claim, *id.* at 1105. Using

---

[2] The other corporate defendants are Signature Homebuilders, LLC; Signature Development of Peoria, Inc.; Signature Homes of Bloomington, LLC; Ironwood Homes, Inc.; and Ironwood Homes of Peoria, LLC. Randy Peifer, an investor in some of the Signature companies, is also a defendant. We refer to the defendants collectively as "Signature."

this standard, we held that no reasonable jury could find infringement. *Id.* Along the way to this conclusion, we noted that Design Basics had not submitted expert testimony to support its claim, relying instead on a conclusory declaration from one of its draftsmen. *Id.* at 1104.

Design Basics tried to avoid that same criticism here by submitting an affidavit from a third-party expert in opposition to Signature's summary-judgment motion. The witness, Matthew McNicholas, is an architect and has served as an outside expert for Design Basics in at least 13 lawsuits. McNicholas asserted that Signature "unquestionably infringed" Design Basics' home plans.

To support that opinion, McNicholas produced a 103-page report. The first 30 pages cover his qualifications and explain his general views on architectural copyright law. Pages 32–85 are descriptions of the ten copyrighted floor plans at issue in this case. This section of his report contains narrative descriptions of the features of each Design Basics floor plan, but the descriptions are remarkably similar to one another. Indeed, some parts are almost word-for-word identical.

A few examples will illustrate. For the Design Basics floor plan called "The Linden," McNicholas wrote: "The idea behind the plan of The Linden focuses on creating a home for entertaining guests, and whose spaces are flexible enough to meet the needs of a broad range of potential homeowner[s]." One of the features he analyzed is the front door:

> From the perspective of a guest, the sheltered front door is a welcome area, not just with the covered stoop, but also composed with walls to

either side of the entry, which shelter against wind and driving rain. This consideration for waiting guests reinforces the entertainment value of this design decision.

His description of the floor plan called "The Manning" is similarly generic: "The concept driving the plan of the Manning centers around creating a home focused on entertainment, but with enough flexibility to evolve into multiple solutions as the homeowner needs, while maximizing privacy." Again, McNicholas described the front door:

> From the perspective of a guest, the sheltered front door is a welcome area, not just with the covered stoop, but also arranged with the long wall of the Living Room as a shelter against driving wind and rain, while waiting for the door to open. This consideration for waiting guests reinforces the entertainment value of this design decision.

His analysis of "The Paterson" is likewise almost identical: "The idea behind the plan of The Paterson focuses on creating a home for entertaining guests, and whose spaces are flexible enough to meet the needs of a broad range of potential homeowner[s]." Regarding the front door, McNicholas wrote:

> From the perspective of a guest, the sheltered front door is not just a welcome area, but with walls to either side of the entry—which shelter against wind and driving rain—it is a considerate space. Further, the sidelight at the door allows for transparency between the interior and exterior, and this thoughtfulness for wait-

ing guests reinforces the entertainment value
of this design decision.

In short, the McNicholas report purports to separately
analyze the distinguishing features of each of the copyright-
ed plans at issue here, but the descriptions are so ordinary
and interchangeable as to be virtually meaningless.

The McNicholas report ends with a visual section con-
taining side-by-side comparisons of the Signature floor plans
and the Design Basics plans they are alleged to infringe. As
the district judge described this section of the report, the
expert "employed extensive color-filling" to depict parallel
rooms in the copyrighted and accused plans in matching
colors in an effort "to make the plans seem more similar."
The judge rejected this technique as an attempt "to manipu-
late and enhance the appearance of similarity." To control
for this problem, the judge extracted the line drawings from
the plans without the color-filling enhancements and con-
fined his analysis accordingly.

Comparing the unenhanced drawings, the judge deter-
mined as a matter of law that no unlawful copying occurred.
He noted multiple categories of dissimilarity between the
copyrighted and accused plans:

> Room dimensions are different. Some plans
> have more rooms than the plans they are al-
> leged to infringe. Ceilings are of different
> heights, and/or are of different styles (i.e., ca-
> thedral versus flat versus tray). Exterior di-
> mensions are different. Bathrooms are in
> different locations. Sinks, tubs, toilets, and
> showers are in different locations within bath-
> rooms. Garages are of different sizes and/or are

in a different orientation to the rest of the house.

Based on these observations and applying *Lexington Homes*, the judge had no difficulty concluding that Signature's plans "are dissimilar enough to avoid infringing the thin copyright" in the Design Basics plans. The judge entered final judgment for Signature, and Design Basics appealed.

## II. Discussion

### A. Proving Copyright Infringement

"Copyright and patents, the Constitution says, are to 'promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.'" *Google*, 141 S. Ct. at 1195 (quoting U.S. CONST. art. I, § 8, cl. 8). To that end, the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, establishes the prerequisites for copyright and sets limits on its scope. *Google*, 141 S. Ct. at 1195–96 (explaining that Congress weighs "the advantages and disadvantages" of copyright protection and establishes "its boundaries and conditions, the existence of exceptions and exemptions, all by exercising its own constitutional power to write a copyright statute").

The basic prerequisites are these: "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression … ." 17 U.S.C. § 102(a). "Originality is a constitutional requirement" arising by implication from the Constitution's reference to "authors" and "writings." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 346 (1991). The threshold for originality is low: "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses

at least some minimal degree of creativity." *Id.* at 345 (citing 1 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 2.01[A], [B] (1990)).

The Act lists categories of works that qualify for copyright protection, including "literary works," "musical works," "dramatic works," and "pictorial, graphic, and sculptural works," among others. § 102(a)(1), (2), (3), (5). "Architectural plans" and "technical drawings" are included in the statutory definition of "pictorial, graphic, and sculptural works" and can be copyrighted in this category. § 101. Until 1990, however, architectural works were not included in § 102(a) as a stand-alone category of protected works. That left some uncertainty about the status of constructed designs—i.e., the buildings themselves—among other complexities in this corner of copyright law. 1 NIMMER ON COPYRIGHT § 2A.09[A] (Rev. ed. 2020); 2 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 3:101–3:107, Westlaw (database updated March 2021).

In 1990 Congress amended the Act to create a separate category of "architectural works" in the § 102(a) list, implementing our nation's obligations under the Berne Convention for the Protection of Literary and Artistic Works. *See* Architectural Works Copyright Protection Act, Pub. L. No. 101-650, §§ 701–706, 104 Stat. 5133 (1990) (codified at 17 U.S.C. § 102(a)(8)). The 1990 legislation added the following definition for the new statutory term "architectural work":

> An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement

and composition of spaces and elements in the design, but does not include individual standard features.

*Id.* § 702 (codified at 17 U.S.C. § 101).

Importantly, the Act limits the scope of copyright protection even for "works that the definitional provisions might otherwise include." *Google*, 141 S. Ct. at 1196. One prominent limitation captures the traditional copyright principle known as the "idea/expression dichotomy"—the line that separates copyrightable expression from noncopyrightable ideas and facts. *Golan v. Holder*, 565 U.S. 302, 328 (2012). Section 102(b) codifies this principle: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

The Act creates a cause of action for infringement and provides as a general matter that "[a]nyone who violates any of the exclusive [statutory] rights of the copyright owner … is an infringer." 17 U.S.C. § 501(a); *see also id.* § 501(b) (providing a cause of action). This generalization doesn't shed much light on what it takes to prove a claim, but the courts have developed and explained the plaintiff's burden of proof. The doctrine begins with this statement from the Supreme Court: "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. This concise formulation obscures a good deal of complexity beneath the surface, but it provides a basic framework for the claim.

The first element—ownership of a valid copyright—is not contested here. Design Basics registered its floor plans with the United States Copyright Office, and Signature does not dispute its ownership or the validity of the copyrights. We therefore assume, as we did in *Lexington Homes*, "that Design Basics owns the plans and that the plans are entitled to some copyright protection, i.e., they were created independently and possess a modicum of creativity" to satisfy the minimal originality requirement. 858 F.3d at 1099.

This litigation turns on the second element, as many infringement cases do. At this step of the general framework, the plaintiff must prove that the defendant "cop[ied] … constituent elements of the [copyrighted] work that are original." *Feist*, 499 U.S. at 361. This element actually encompasses two distinct questions, although our caselaw hasn't always neatly separated them. The first question is whether, as a factual matter, the defendant copied the plaintiff's protected work (as opposed to independently creating a similar work); the second question is whether the copying "went so far as to constitute an improper appropriation." *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982); *see also* 4 NIMMER ON COPYRIGHT § 13.01[B] (Rev. ed. 2020) (explaining the two components of the second element in the *Feist* framework).

The Ninth Circuit refers to these distinct subsidiary elements as "copying" and "unlawful appropriation." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018). The Second Circuit uses the terms "copying" and "wrongful copying." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100 (2d Cir. 2014). Whatever the nomenclature, the point is to capture the important differences between the two.

In all infringement cases, the plaintiff must prove, as a factual matter, that the defendant *actually copied* his work. *Lexington Homes*, 858 F.3d at 1099. "Proof of copying by the defendant is necessary because independent creation is a complete defense to copyright infringement." *Rentmeester*, 883 F.3d at 1117. For "[n]o matter how similar the plaintiff's and the defendant's works are, if the defendant created his independently, without knowledge of or exposure to the plaintiff's work, the defendant is not liable for infringement." *Id.*

Importantly, proof of actual copying is necessary but not sufficient to establish liability for infringement. "Not all copying … is copyright infringement," *Feist*, 499 U.S. at 361, so the plaintiff must *also* prove that the defendant's copying was wrongful—i.e., that the defendant took enough of his protected expression (as opposed to unprotectable ideas, concepts, facts, etc.) to constitute unlawful appropriation of his expressive work. *Rentmeester*, 883 F.3d at 1117; *Zalewski*, 754 F.3d at 100–01.

The first of these subsidiary elements—let's call it "actual copying" or "copying in fact"—can be proved either directly or indirectly. Direct evidence is rare, so many cases turn on inferences to be drawn from circumstantial evidence. A circumstantial case of actual copying requires: (1) evidence that the defendant had access to the plaintiff's copyrighted work (enough to support a reasonable inference that the defendant had an *opportunity* to copy); and (2) evidence of a substantial similarity between the plaintiff's work and the defendant's work (enough to support a reasonable inference that copying *in fact* occurred). *Lexington Homes*, 858 F.3d at 1099; *see also Rentmeester*, 883 F.3d at 1117; *Zalewski*, 754 F.3d at 100–01.

We have acknowledged the possibility that an accused work may bear such "an uncanny resemblance" to a copyrighted work that copying is "the only plausible explanation" for the similarity. *Lexington Homes*, 858 F.3d at 1100. In such a case, "further proof of access may not be required." *Id.* But the exception is "rare" and reserved for "unusual cases." *Id.* Ordinarily, "to prove a circumstantial case of copyright infringement, the plaintiff must separately prove both access and similarity." *Id.*

Confusion sometimes arises because the test for unlawful appropriation—a distinct inquiry—*also* looks for substantial similarity between the defendant's work and the plaintiff's work. As the Second Circuit has explained, "a close similarity between two works is often relevant to proving *both* actual copying and wrongful copying." *Zalewski*, 754 F.3d at 101 (emphasis added). Accordingly, the cases often use "the same term—'substantial similarity'—to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation." *Rentmeester*, 883 F.3d at 1117. But "[t]he term means different things in those two contexts." *Id.*

The difference hinges on the distinction between the protected and unprotected elements in the plaintiff's work. *Id.*; *see also Zalewski*, 754 F.3d at 101. When used as a test for actual copying in a circumstantial case, the requirement of "substantial similarity" is not limited to the protected elements of the plaintiff's work. Similarities that relate to either the protected *or* unprotected elements of the plaintiff's work may be probative of actual copying; the inquiry simply looks for the kind and degree of similarity that "one would not expect to arise if the two works had been created independently." *Rentmeester*, 883 F.3d at 1117. Put somewhat

differently, in a circumstantial case, the plaintiff has the burden to show that the two works are so similar that copying is a better explanation for the similarities than pure coincidence.

But "similarity that relates to *unprotected* elements is probative only of [actual] copying—not wrongful copying." *Zalewski*, 754 F.3d at 101 (emphasis added). *Wrongful* copying—unlawful appropriation—requires substantial similarities between the defendant's work and *protected elements* in the plaintiff's copyrighted work. *Rentmeester*, 883 F.3d at 1117. "When an original work contains many *un*protected elements, … a close similarity between it and a copy may prove only copying, not wrongful copying." *Zalewski*, 754 F.3d at 101.

To preserve the distinction between these two concepts, we will follow the Second Circuit's lead and use the term "probative similarity" to refer to the degree of similarity necessary to support an inference of actual copying and the term "substantial similarity" to refer to the test for wrongful copying or unlawful appropriation. *Id.*

Our circuit, like most others, uses the "ordinary observer" test for unlawful appropriation: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protect[a]ble expression by taking material of substance and value." *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508–09 (7th Cir. 1994) (quoting *Atari*, 672 F.2d at 614).[3]

---

[3] *See also Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33–34 (1st Cir. 2001); *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000); *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 120 (8th Cir. 1987);

### B. *Scènes à Faire* and Merger

In *Lexington Homes* we explained at length that under the *scènes à faire* and merger doctrines, Design Basics holds only thin copyright protection in its floor plans. Just a brief recap is needed here.

Standard elements in a genre—called *scènes à faire*[4] in copyright law—get no copyright protection. *Scènes à faire* are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 929 (7th Cir. 2003). If standard elements received copyright protection, then the creation of a single work in a genre would prevent others from contributing to that genre because the copyright owner would have exclusive rights in all of the genre's basic elements.

We explained in *Lexington Homes* that Design Basics' floor plans largely consist of *scènes à faire*. 858 F.3d at 1102–03. Every plan has a kitchen, a great room or living room, a dining room, bedrooms, bathrooms, and so forth. The arrangements of the rooms are also largely *scènes à faire*. The kitchen is always close to the dining room; the bedrooms will usually be clumped together and near a bathroom; the door from the garage into the house usually leads to the kitchen rather than the great room or living room.

What accounts for these familiar arrangements? Convention in this genre, certainly, which brings this particular type

---

*Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 907 (3d Cir. 1975); *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946).

[4] French for "scenes for action." *Scènes à faire*, BLACK'S LAW DICTIONARY (11th ed. 2019).

of architectural work within the *scènes à faire* doctrine.[5] But the arrangements are also dictated by functionality. The kitchen is near the dining room so that food can easily be moved between the two rooms. The bedrooms aren't near the front hall because guests don't venture into the bedrooms.

The functionality of the room arrangements is where the doctrine of merger comes in. Merger arises from § 102(b), which, as we've explained, codifies the idea–expression dichotomy and specifies that copyright never extends to an idea, procedure, principle, or concept. Copyright protects only expression; patent law is the proper instrument for protecting functionality. *See Eldred v. Ashcroft*, 537 U.S. 186, 217 (2003).

Merger doctrine prevents the use of copyright to protect an idea or procedure. If an idea or procedure can be expressed in only a few ways, it is easy to copyright every form in which the idea can be expressed, indirectly protecting the idea itself. 4 NIMMER ON COPYRIGHT § 13.03[B][3]; *see also Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678–79 (1st Cir. 1967). To guard against this kind of overprotection, when an idea can be expressed in only limited ways, courts say that the expression "merges" into the idea and cannot receive copyright protection. *Lexington Homes*, 858 F.3d at 1102. For example, the forms used to implement a particular method of accounting are an expression of the accounting method and cannot be copyrighted. *Baker v. Selden*, 101 U.S. 99 (1879). The same is true for the rules of a sweepstakes competition: because there are a limited number of ways to

---

[5] Recall as well that under the definition of an architectural work, "individual standard features" are not protected. 17 U.S.C. § 101.

explain the rules, the expression of the rules receives little, if any, copyright protection. *Morrissey*, 379 F.2d at 678–79.

Merger also applies to the Design Basics home plans. The functional requirements of living spaces dictate that particular rooms be placed close together. And the general concept of the affordable, multipurpose, suburban, single-family home also contributes to the design. This isn't to say that there is only *one* way to arrange the rooms in this home-design genre. But there are only a limited number of possible floor plans, and by creating more than 2,800 of these plans, Design Basics has attempted to occupy the entire field. We wondered in *Lexington Homes* if "there is any blueprint for a single-family home anywhere in the country that Design Basics could not match to one of its own designs." 858 F.3d at 1103. If Design Basics held any more than thin copyright protection in its floor plans, it would own nearly the entire field of suburban, single-family home design.

The McNicholas report reinforces our holding in *Lexington Homes* that the copyright in the Design Basics floor plans is thin. Although McNicholas set out to demonstrate the unique nature of the ten plans at issue here, his report demonstrates just the opposite. As we've explained, the report describes each floor plan in generic and often nearly identical language. The report shows that each floor plan uses the same design features to accomplish the same ends.

Accordingly, although Design Basics asks us to revisit our decision in *Lexington Homes*, we see no reason to do so.[6]

_____

[6] Design Basics urges us to instead adopt the First Circuit's approach in *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97 (1st Cir. 2006), which looked to similarities in the "overall form" of the buildings to assess architectural copyright infringement. *Id.* at 113–14. Design Basics is wrong to suggest that our approach differs from the First Circuit's.

To the contrary, we reiterate our conclusion that Design Basics holds only thin copyright in its floor plans. *Id.* at 1101–02. And in this particular architectural genre in which copyright protection is thin, proving unlawful appropriation takes more than a substantial similarity between the plaintiff's work and the defendant's work. Instead, only a virtually identical plan infringes the plaintiff's copyrighted plan. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1013–14 (7th Cir. 2005).

## C. Application

We can make short work of applying these principles to this record. Except for the 2461 Shawnee plan, Design Basics has no direct evidence of actual copying. For the remaining nine plans, it must rely on circumstantial proof of actual copying, which requires evidence of both access and probative similarity.

We can safely skip the issue of access. The district judge aptly observed that the Signature plans are dissimilar in material respects from the plans they are alleged to infringe. They have different room dimensions, ceiling heights and styles, and exterior dimensions. Some have a different number of rooms, and the garages are sometimes placed at

---

*T-Peg*, like *Lexington Homes*, applied well-established principles of copyright law to the facts at hand. But the facts in *T-Peg* were materially different from this case and from *Lexington Homes*. The architectural plans at issue there were for a timber-frame home, a design driven as much by aesthetics as by functionality. *Id.* at 101. The First Circuit thus reasonably refrained from holding that the *scènes à faire* and merger doctrines meant that the timber-frame home plans received limited protection. There is no reason to think that the First Circuit would analyze plans for suburban, single-family tract homes any differently than we did in *Lexington Homes*.

different angles to the homes. These differences are enough as a matter of law to preclude an inference of actual copying.

For the same reason, even if we assume that actual copying occurred in the case of the 2461 Shawnee floor plan, no reasonable jury could find unlawful appropriation. Signature's Lot 119 Lake Falls floor plan is not virtually identical to the 2461 Shawnee. Though both designs depict a one-story ranch with a kitchen, breakfast room, great room, dining room, three bedrooms, and two bathrooms in the same general locations, *see* Appendix, the Signature plan is different from the 2461 Shawnee in some notable ways. It has greater square footage, and the room dimensions are subtly different. The ceilings have different heights, and the two homes have different aspect ratios. The 2461 Shawnee has a two-car garage and its walls are parallel to the home, while the Lot 119 Lake Falls plan features a three-car garage placed at an angle to the rest of the home. Although most of the rooms are located in the same relative positions, some are not: where the 2461 Shawnee plan places a bathroom, the Lot 119 Lake Falls plan has a walk-in closet.

In a field unconstrained by convention and functionality, the similarity of the overall layouts of the two floor plans would be noticeable. But suburban, single-family housing is a field with many standard elements and limited possibilities for creativity, so the Lot 119 Lake Falls plan must be virtually identical to the 2461 Shawnee to infringe Design Basics' thin copyright. Under this standard, Signature's plan is noninfringing as a matter of law.

Finally, we note for completeness that we find no flaw in the district judge's conclusion that Signature's plans are dissimilar enough to preclude liability even under ordinary substantial-similarity analysis. As we explained when

discussing probative similarity, each Signature plan features different room dimensions, ceiling styles and heights, and exterior dimensions than the Design Basics plan it is alleged to infringe. The number and placement of rooms is sometimes different, as is the size and (in some cases) the location of the garage. Accordingly, the judge correctly concluded that the Signature plans are noninfringing under conventional substantial-similarity analysis; the plans are certainly not virtually identical to the Design Basics plans they are alleged to infringe. Summary judgment for Signature was proper.

AFFIRMED

# Appendix

## Design Basics' 2461 Shawnee Plan



## Signature Construction's Lot 119 Lake Falls Plan

